**P. J. TAGGARES COMPANY, INC. and Simtag Farms, Plaintiffs,**

v.

**NEW YORK MERCANTILE EXCHANGE, Defendant.**

No. 78 Civ. 4388.

United States District Court, S. D. New York.

July 16, 1979.

Curtis, Mallet-Prevost, Colt & Mosle, New York City, for plaintiffs; Peter Fleming, Jr., Herbert Stoller, Samuel F. Abernethy, Frank Maas, New York City, of counsel.

Rein, Mound & Cotton, New York City, Cahill, Gordon & Reindel, New York City, for defendant; Maurice, Mound, William E. Hegarty, Charles Platto, Ruth D. MacNaughton, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Plaintiffs trade in potato futures contracts through brokers who are clearing members of the New York Mercantile Exchange ("Exchange"). They commenced this action against the Exchange to recover damages they allegedly sustained as a result of the January 1977 action of its President in increasing the margin requirements of clearing members for the May 1977 Maine Potato Futures Contract from $500 to $5,000 per contract. The increased margin requirements applied to the positions held by Exchange members, as of February 3, 1977, "for any customer who failed to deliver against the May 1976 Potato Futures Contract, including any positions controlled or related to such customer." The clearing members were notified that the President's action was taken pursuant to section 31.08(c) of the Exchange Rules.[1]

Plaintiffs were within the category of customers "who failed to deliver against the May 1976 Potato Futures Contract." Their complaint alleges that as of February 1, 1977, they had a "net short" position of 1,045 May 1977 potato futures contracts; that as a result of the Exchange's action in increasing the margin requirements, their brokers called upon them to post additional margin; that since they were unable or unwilling to comply therewith they were forced to liquidate their net short position on the 1,045 open contracts by purchasing offsetting contracts under unfavorable conditions and thereby sustained substantial losses. The complaint further alleges that the increased margin requirements, while purporting to describe a class of customers, in fact applied solely and discriminatorily to plaintiffs and required their brokers to "maintain with respect to their open May Contracts margin in an amount ten times as

---

1. Now Rule 41.08(c), which provides: "Emergency Margins: The President shall have the power to request additional margin from any Clearing Member where, in his opinion, circumstances may so warrant."

great as that required with respect to the May Contracts of all other persons."[2] Plaintiffs allege on information and belief that the reason for the Exchange's discriminatory action was its view that plaintiffs were attempting to manipulate the market in the May Contract by intentionally planting a false news report with the Reuters News Agency and taking trading advantage of the market effect of that false report; that the Exchange's action was taken without prior notice to plaintiffs, without any investigation and without proper inquiry as to who was responsible for the erroneous news story.[3]

Four separate claims are alleged: (1) that the imposition of the increased margin requirement with respect to the May 1977 contracts carried by Exchange members for plaintiffs' account constituted a denial to plaintiffs of access to the Exchange in contravention of the procedures provided in section 8c(1) of the Commodity Exchange Act ("Act");[4] (2) that the increased margin requirement, which had the effect of requiring the plaintiffs to buy in their short positions without imposing a comparable requirement on any prospective seller, was in violation of the Exchange's contractual and statutory obligation to operate a fair and orderly market; (3) that the Exchange, in acting upon factual assumptions that were incorrect and which the Exchange failed to investigate, imposed the increased margin requirement negligently and with reckless disregard for the likely consequences; and (4) that the Exchange contracted, conspired and combined with its members and others to exclude plaintiffs from participation in the May 1977 contract market in violation of section 1 of the Sherman Act.[5]

The defendant now moves pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint for failure to state a claim upon which relief can be granted on the grounds that (1) no cause of action exists under section 8c(1) of the Act for denying traders access to an exchange on the basis of an increase in margin requirements and (2) that the second, third, and fourth claims are insufficient absent an allegation of fraud or bad faith on the part of the Exchange in ordering the margin increases.

With respect to their claim of denial of access to Exchange facilities, plaintiffs' theory is that the requirement for additional margin was "discriminatory" and was "a clear-cut attempt to discipline the plaintiffs for conduct that the Exchange considered improper [and] was, in essence, the equivalent of a $4,500 fine per contract" which made "further trading by plaintiffs an impossibility and was obviously intended to do

---

2. Complaint ¶ 17.

3. Richard B. Levine, the Exchange's President, submitted an affidavit which sets forth the underlying reasons for his action asserting it was taken in good faith in an effort to provide adequate security for performance and to avoid potential market disruption with the prospect of a repetition of a disastrous and highly publicized debacle in the May 1976 Maine Potato Futures Contract, which explanation differs markedly from plaintiffs' theory. Since plaintiffs' counsel objected to the Levine affidavit because of the prospect that its consideration would convert the instant motion to one for summary judgment under Rule 56, no reference will be made to its allegations and the instant motion is considered solely on the basis of plaintiffs' complaint.

4. 7 U.S.C. § 12c(1) provides:
(1)(A) Any exchange or the Commission if the exchange fails to act, may suspend, expel, or otherwise discipline any person who is a member of that exchange, or deny any person access to the exchange. Any such action shall be taken solely in accordance with the rules of that exchange.
(B) Any suspension, expulsion, disciplinary, or access denial procedure established by an exchange rule shall provide for written notice to the Commission and to the person who is suspended, expelled, or disciplined, or denied access, within thirty days, which includes the reasons for the exchange action in the form and manner the Commission prescribes. An exchange shall make public its findings and the reasons for the exchange action in any such proceeding, including the action taken or the penalty imposed, but shall not disclose the evidence therefor, except to the person who is suspended, expelled, or disciplined, or denied access, and to the Commission.

5. 15 U.S.C. § 1.

just that." [6] Section 8c(1) of the Act upon which plaintiffs predicate their argument provides in part:

Any exchange or the Commission if the exchange fails to act, may suspend, expel, or otherwise discipline any person who is a member of that exchange, or deny any person access to the exchange. Any such action shall be taken solely in accordance with the rules of that exchange. [7]

By its terms this provision clearly relates to disciplinary action by an exchange against its members and to denials of membership therein. Plaintiffs' argument that the phrase "or deny any person access to the exchange" gives the provision a broader scope so that it applies to *any* exchange action, including the setting of margin levels, which adversely affects *any* person, whether a member, an applicant for membership or a trader, twists the clear import of the statutory language. The section is concerned with disciplinary proceedings by an exchange whose actions are subject to affirmance, modification or remand by the Commodity Futures Trading Commission ("Commission"), which in turn is subject to judicial review. [8] As the Conference Report on the 1974 amendments to the Act indicates, the aim of the section is to "(a) authorize[ ] the Commission to discipline exchange members if the exchange fails to act and (b) permit[ ] a member who is disciplined by an exchange to appeal to the Commission." [9]

Further, the Commission itself in proposing rules to implement section 8c(1) has equated the phrase "denial of access" with denial of membership. [10] As the Commission stated: "A denial of membership in an exchange is a denial of access within the meaning of section 8c and is therefore governed by the proposed rules. The privileges of exchange membership that an applicant is denied are precisely the privileges which a member losses [sic] when suspended or expelled, with which section 8c is fundamentally concerned." [11] The defendant correctly states that to construe an increased margin requirement as a denial of access to an exchange under section 8c(1) would be tantamount to authorizing every trader who fails to meet margin demands, upon an assertion that they are excessive and beyond his purse, to charge that he was denied access. Common sense and the clear purpose of section 8c(1) require rejection of plaintiffs' claim. Accordingly, count one of the complaint is dismissed.

We consider next that branch of defendant's motion requesting dismissal of the second, third and fourth claims for failure to allege fraud or bad faith on the part of the Exchange in ordering the margin increases. With respect to count two charging violation of the Exchange's statutory duties, it is not disputed that a primary function of an exchange is to protect the public interest and to preserve an orderly market and that, in furtherance of that

6. Plaintiffs' Memorandum of Law at 28–29.

7. 7 U.S.C. § 12c(1)(A).

8. *Id.* § 12c(3).

9. Conf.Rep.No.93–1383, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Admin. News, pp. 5843, 5900.

10. *See, e. g.,* CFTC Release "Adoption of Part 8—Exchange Procedures for Disciplinary, Summary and Membership Denial Actions," 43 Fed.Reg. 41950, 41961 (Sept. 19, 1978) (to be codified in 17 C.F.R. part 8); CFTC Release "Commission Review of Exchange Disciplinary or Other Adverse Action: Proposed Procedures and Standards," 42 Fed.Reg. 30472, 30472 n. 1 (June 14, 1977). The adoption of the regulations proposed in the latter release was announced in CFTC Release "Procedures and

Standards Governing Commission Review of Exchange Disciplinary or Other Adverse Action," 43 Fed.Reg. 59343 (Dec. 20, 1978) (to be codified in 17 C.F.R. part 9).

11. 42 Fed.Reg. at 30472 n. 1 (June 14, 1977). One exchange voiced opposition to the Commission's equation of denials of access with denials of membership, asserting that the phrase "denial of access" was "intended to affirm the legal right of an exchange to bar nonmembers from trading privileges on its facilities and from physical entry to its premises for security and other reasons." 43 Fed.Reg. at 41961 (Sept. 19, 1978). While this view would extend section 8c(1) to encompass traders as well as members and applicants for membership, it does not approach the expansive interpretation proposed by plaintiffs.

function, it is accorded broad powers to regulate the conduct of the business of its members.[12] The Exchange acts under the authority of the Commodity Exchange Act which, among other matters, is designed to avoid manipulative speculation in various commodities futures contract markets. The Exchange is required to furnish to the appropriate governmental agency, the Commodities Futures Trading Commission, copies of its by-laws, rules and regulations and any proposed changes therein,[13] and the Commission has the power to alter or suspend the rules under appropriate circumstances to ensure fair dealing in the market.[14]

■■ The Exchange and its officials in the discharge of their statutory duties and regulatory responsibilities are entitled to the benefit and protection of the business judgment rule and absent allegations of bad faith may not be held for discretionary actions taken in the discharge of their duties pursuant to the rules and regulations of the Exchange. The doctrine was first enunciated in *Daniel v. Board of Trade*,[15] in which orders issued by the Chicago Board of

Trade, forbidding further trading in plaintiffs' outstanding futures contracts and providing for their liquidation, were challenged. The Court held that:

> In the promulgation of its regulations, the Board acted in the conduct of the prudential affairs of the Board as any corporation would act in determining corporate policy. Because of the Board's relation to the public, it must . . . act with the utmost objectivity, impartiality, honesty, and good faith. . . .
>
> We have no hesitancy in holding that in the absence of such infidelity to their trust by said directors, governors and officers of the Board . . . as to amount to fraud, the acts and conduct of the defendants as set forth in the amended complaint are insufficient to entitle the plaintiffs to any relief.[16]

The salutory principle stated in *Daniel* has long been followed in this Court and others.[17]

■ Here the President of the Exchange acted under the express authority of Rule 31.08(c).[18] Under Exchange Rules, every

---

**12.** *See, e. g.,* 7 U.S.C. §§ 7, 7a.

**13.** *Id.* § 7a(1).

**14.** *Id.* §§ 7(a)(12), 12a(7). Under the Act, the Exchange retains broad and flexible powers with respect to margin requirements. Thus, although copies of all Exchange bylaws, rules and regulations must be submitted to the Commission pursuant to 7 U.S.C. § 7a(1), rules relating solely to setting of levels of margin are excepted from the requirement of Commission approval contained in § 7a(8) & (12). The Commission's power to alter or supplement Exchange rules, § 12a(7), does not apply to margin requirements unless the Commission acts pursuant to the emergency powers provided in § 12a(9). *See* S.Rep.No.93–1131, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Admin.News pp. 5843, 5879.

Section 12a(9) specifically provides that the definition of "emergency" contained therein for purposes of Commission action is not to be construed "to limit the meaning or interpretation given by a contract market to the terms 'market emergency', 'emergency', or equivalent language in its own bylaws, rules, regulations, or resolutions."

On November 3, 1976, the Commission took issue with the Exchange's exercise of its margin setting powers for the November 1976

Maine Potatoes Contract, ordering the Exchange to increase margin requirements to a level at least equal to the full market value of each open contract. [1975–1977 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,233. The Commission directive was prompted by a finding that the Exchange "had clearly failed to exercise its responsibilities." *Id.* ¶ 20,237, at 21,266.

**15.** 164 F.2d 815 (7th Cir. 1947).

**16.** *Id.* at 819–20.

**17.** *See, e. g., Lagorio v. Board of Trade,* 529 F.2d 1290, 1292 (7th Cir.), *cert. denied,* 426 U.S. 950, 96 S.Ct. 3171, 49 L.Ed.2d 1187 (1976); *Smith v. Groover,* 468 F.Supp. 105 (N.D.Ill. 1979); *Compania de Salvadorena de Cafe, S. A. v. Commodities Futures Trading Comm'n,* 446 F.Supp. 687, 691 (S.D.N.Y.1978).

**18.** See note 1 *supra.* We reject plaintiffs' contention that the Exchange violated its own rules. Rule 51.16(c)(1) [now 60.15(C)(1)] provides for routine increases in initial margin and states that such additional margin requirements "shall apply to all new as well as all existing trades in such futures." To interpret this rule as plaintiffs contend would render

contract traded on the Exchange is subject to its charter, by-laws and rules.[19] These rules are binding not only upon Exchange members such as plaintiffs' brokers but also upon nonmembers such as plaintiffs who traded on the market through Exchange members.[20] Accordingly, the Exchange, having taken the complained of action pursuant to authority vested in its President, "violated no rights of the plaintiffs . . in the absence of an averment of bad faith amounting to fraud."[21] Plaintiffs' complaint fails to allege that the order for increased margin was issued in "bad faith" and, if so, in what respect as required by Rule 9(b) of the Federal Rules of Civil Procedure.[22]

■ The requirement of such an allegation applies equally to the third count of the complaint, also grounded upon the increased margin requirement, which plaintiffs describe as a state law claim of negligence. Citing New York cases concerning the liability of directors of business corporations,[23] plaintiffs state that "[i]n order to invoke the protective umbrella of the business

judgment rule under such a cause of action, the Exchange must first establish that it acted with reasonable diligence, as an ordinarily prudent person would under similar circumstances." No cases concerning challenges to regulatory action by an exchange are cited by plaintiffs. In *Garcia Sugars Corp. v. New York Coffee & Sugar Exchange,*[24] however, the state court construed such a challenge as one for unlawful interference with contractual rights and held that the exchange "having acted in accordance with bylaws, rules and regulations, all of which were made an integral part of the contract upon which the plaintiff bases its cause, and *no ulterior motive* exclusively directed against the plaintiff and the plaintiff's best interest being evinced in the testimony elicited at this trial, no condemnation of the conduct of the Exchange can be had."[25] The reference to "ulterior motive" indicates that the standard by which the Exchange's conduct is to be measured under state law accords with that adopted in *Daniel,* rather than with the

Rule 31.08(c), which provides for margin increases applicable to *"any* Clearing Member," a nullity. Nor do we find persuasive plaintiffs' assertion that because Rule 31.08(c) is entitled "Emergency Margins" the President's power under that rule may only be exercised in a Board-declared emergency pursuant to Exchange By-Law 23.19. That By-Law applies in the case of an "exceptional contingency not provided for in the By-Laws or Rules," 23.-19(a)(1), and the powers expressed therein are "in addition to, and not in lieu of, any powers of the Board, the President or any Committee pursuant to any other By-Law or Rule," 23.-19(d)(3). Moreover, the Exchange's interpretation of its own rules is entitled to substantial weight. *Lagorio v. Board of Trade,* 529 F.2d 1290, 1291 (7th Cir.), *cert. denied,* 426 U.S. 950, 96 S.Ct. 3171, 49 L.Ed.2d 1187 (1976); *Case & Co. v. Board of Trade,* 523 F.2d 355, 363 (7th Cir. 1975).

**19.** Exchange Rule 53.05 (formerly Rule 43.05).

**20.** *Cargill Inc. v. Board of Trade,* 164 F.2d 820, 823 (7th Cir. 1947), *cert. denied,* 333 U.S. 880, 68 S.Ct. 912, 92 L.Ed. 1155 (1948); *Crowley v. Commodity Exchange,* 141 F.2d 182, 188 (2d Cir. 1944).

**21.** *Daniel v. Board of Trade,* 164 F.2d 815, 819 (7th Cir. 1947).

**22.** Plaintiffs' contention that the complaint, by its claim of "discriminatory" conduct, adequately, if not in *haec verba,* alleges bad faith is without merit. As the *Daniel* case indicates, "bad faith" means ulterior motive, for example, personal gain. *Id.* at 820; *accord, Miller v. New York Produce Exchange,* 550 F.2d 762, 767 (2d Cir.), *cert. denied,* 434 U.S. 823, 98 S.Ct. 68, 54 L.Ed.2d 80 (1977); *cf. Lagorio v. Board of Trade,* 529 F.2d 1290, 1291 (7th Cir.), *cert. denied,* 426 U.S. 950, 96 S.Ct. 3171, 49 L.Ed.2d 1187 (1976) (rejecting challenge to Board's action in suspending trading in futures contracts but excepting new sales for actual delivery).

**23.** *See, e. g.,* N.Y.Bus.Corp.Law § 717 (McKinney's Supp. 1978–1979); *Syracuse Television, Inc. v. Channel 9, Syracuse, Inc.,* 51 Misc.2d 188, 273 N.Y.S.2d 16, 27 (Sup.Ct.1966); *Casey v. Woodruff,* 49 N.Y.S.2d 625, 643 (Sup.Ct. 1944).

**24.** 7 N.Y.S.2d 532 (Sup.Ct.1932), *aff'd sub nom. Rifkind v. New York Coffee & Sugar Exchange,* 258 App.Div. 871, 16 N.Y.S.2d 1023 (1st Dep't 1939).

**25.** *Id.* at 534 (emphasis added).

"prudent person" standard proposed by plaintiffs.[26]

Nor can the plaintiffs draw support for their negligence claim from the decision of our Court of Appeals in *Miller v. New York Produce Exchange.*[27] The Court expressly did not reach the issue of the propriety of the trial court's submission of a negligence claim to the jury because the jury returned a verdict in favor of the defendant.[28] Moreover, at the trial court level the negligence count was confined to plaintiff's claim of nonfeasance against the Exchange.[29] The difference in the standards applied to an exchange's failure to enforce its rules and to exchange regulatory action was recently noted in *Smith v. Groover.*[30] In finding a private right of action against the Chicago Board of Trade for failing to report violations of the Act when it "knew or should have known" that such had occurred, the court stated: "Our decision that a private right of action against the [Board] exists for the conduct complained of here, therefore, in no way vitiates the previously recognized immunity which the Board enjoys when it in good faith exercises the discretion accorded it by the [Act]."[31]

Finally, an allegation of fraud or bad faith is also required to sustain the claim of antitrust violation in count four. Although a charge of bad faith may not be necessary to every claim of antitrust abuse by an exchange,[32] in this Court's view it is essential when the conduct complained of, as here, is closely related to the exchange's performance of its statutory duty to maintain a fair and orderly market.[33] Thus in a companion case to *Daniel, Cargill, Inc. v. Board of Trade,*[34] the Court held: "Almost every act of an agency such as the Board . . . affects or restrains commerce in some respect, but such restraints as may be within the rule of reason are not unlawful. . . . Only the bad faith of the defendants in the discharge of their duties under the emergency in which they purported to act can vitiate the defendants' action. No such claim of bad faith is made in this case."[35] Even on plaintiffs' version of the Exchange's motivation for requiring the margin increase—that it was based on the

**26.** See note 22 *supra.*

**27.** 550 F.2d 762 (2d Cir.), *cert. denied,* 434 U.S. 823, 98 S.Ct. 68, 54 L.Ed.2d 80 (1977).

**28.** *Id.* at 767.

**29.** *Seligson v. New York Produce Exchange,* 378 F.Supp. 1076, 1084–85 (S.D.N.Y.1974).

**30.** 468 F.Supp. 105 (N.D.Ill.1979).

**31.** *Id.,* at 118. A negligence standard has similarly been applied in reviewing the failure of stock exchanges to enforce their rules when such nonenforcement results in injury to the customers of member firms. *See, e. g., Rich v. New York Stock Exchange,* 522 F.2d 153, 155 n. 4 (2d Cir. 1975); *Baird v. Franklin,* 141 F.2d 238 (2d Cir.), *cert. denied,* 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591 (1944); *Evans v. Kerbs & Co.,* 411 F.Supp. 616, 625 (S.D.N.Y.1976). Section 6 of the Securities Exchange Act, 15 U.S.C. § 78f, which imposes an affirmative duty of self-regulation upon stock exchanges and is the source of the above liability to customers, has its parallel in § 5a of the Commodity Exchange Act, 7 U.S.C. § 7a, which specifically requires a contract market to enforce its bylaws, rules, and regulations, *id.* § 7a(8), (9).

**32.** This question was explicitly left undecided by the majority in *Silver v. New York Stock Exchange,* 373 U.S. 341, 366, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), but Justices Stewart and Harlan in dissent urged that "the Securities Exchange Act removes antitrust liability for any action taken in good faith to effectuate an exchange's statutory duty of self-regulation," *id.* at 371, 83 S.Ct. at 1264.

**33.** When the challenge is to the Exchange's action, or failure to act, with respect to trading in particular contracts, an allegation of bad faith is typically made. For example, in *Seligson v. New York Produce Exchange,* 378 F.Supp. 1076, 1105 (S.D.N.Y.1974), the "bad faith regulation" alleged as a predicate to the antitrust count was a conspiracy to "depress market prices in order to benefit the short interests at the expense of the longs." *See also Deaktor v. L. D. Schreiber & Co.,* 479 F.2d 529, 538 (7th Cir.) (Castle, J., concurring), *rev'd per curiam sub nom. Chicago Mercantile Exchange v. Deaktor,* 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973) (defendants charged with artificially depressing the price of egg futures "for their own advantage").

**34.** 164 F.2d 820 (7th Cir. 1947), *cert. denied,* 333 U.S. 880, 68 S.Ct. 912, 92 L.Ed. 1155 (1948).

**35.** *Id.* at 823.

belief that "plaintiffs were attempting to manipulate the market in the May Contracts by intentionally planting a false news report with Reuters and taking trading advantage of the market effect of that report"[36]—the Exchange acted within its statutory mandate to protect the integrity of the market.[37]

Relying on the Supreme Court's decision in *Silver v. New York Stock Exchange,*[38] plaintiffs nonetheless contend that imposition of the increased margin requirement, even if made in good faith, constituted an illegal restraint of trade because plaintiffs were not given an opportunity to be heard. In *Silver,* the New York Stock Exchange required its members to remove private direct telephone wires which had enabled petitioners, nonmember broker/dealers, to remain in constant contact with the trading desks of member firms. Noting the familiar principle that repeals by implication are not favored,[39] the Court refused to find an absolute immunity from antitrust liability for exchange self-regulation.[40] Although the challenged conduct would have been per se violative of the antitrust laws as a group boycott if performed by others, the Court eschewed per se concepts and applied the rule of reason,[41] precisely the approach taken by the *Cargill* court. The Supreme Court found that the lack of procedural safeguards accompanying the deprivation of the private wire services was unfair, served no policy of the Securities and Exchange Act and therefore violated the Sherman Act.[42]

There is no indication in the Supreme Court's opinion that the due process safeguards found necessary on the facts of that case are an invariable prerequisite to the legality of all exchange actions. No urgency prompted the order to remove the private wires; nor was it directed to a specific perceived threat to the integrity of the market, as was the Exchange action taken here. In a recent case in this district, *Compania de Salvadorena de Cafe, S. A. v. Commodities Futures Trading Commission,*[43] the challenge to an emergency resolution of the New York Coffee and Sugar Exchange, directing all those who owned or controlled coffee futures contracts to liquidate their positions on a phased schedule, rested precisely on due process grounds. In granting the exchange's motion to dismiss, the court noted the plaintiffs' claim that the exchange "declared an emergency without notice, hearing, or specific findings of fact and that the remedy it imposed was arbitrarily severe,"[44] but held that the exchange's action was fully countenanced by its by-laws and absent an allegation of "bad faith tantamount to fraud" was not actionable.[45]

### Conclusion

Count one of the complaint is dismissed. In addition, counts two, three and four are dismissed but with leave to plaintiffs, if so advised, to serve an amended complaint within twenty days from date. So ordered.

**36.** Complaint ¶ 20.

**37.** One of the conditions for designation of an exchange as a "contract market" under the Act is that "the governing board thereof provides for the prevention of dissemination by the board or any member thereof of false or misleading or knowingly inaccurate reports concerning crop or market information or conditions that affect or tend to affect the price of commodity in interstate commerce." 7 U.S.C. § 7(c).

**38.** 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).

**39.** *Id.* at 357, 83 S.Ct. 1246, *citing United States v. Borden Co.,* 308 U.S. 188, 198, 60 S.Ct. 182, 84 L.Ed. 181 (1939).

**40.** *Id.* at 360–61, 83 S.Ct. 1246.

**41.** *Id.* at 360, 83 S.Ct. 1246; *see Jacobi v. Bache & Co.,* 520 F.2d 1231, 1238 (2d Cir. 1975) (Friendly, J.), *cert. denied,* 423 U.S. 1053, 96 S.Ct. 784, 46 L.Ed.2d 642 (1976).

**42.** 373 U.S. at 361, 83 S.Ct. 1246. Unlike plaintiffs here, the petitioners in *Silver* repeatedly sought an explanation from the Exchange for its decision but disclosure of the underlying reasons was refused. *Id.* at 344, 83 S.Ct. 1246.

**43.** 446 F.Supp. 687 (S.D.N.Y.1978).

**44.** *Id.* at 689.

**45.** *Id.* at 691.