Lyle JORDON, Ueal Patrick, and Frank Pancerz, Plaintiffs,

v.

NEW YORK MERCANTILE EX-CHANGE, et al., Defendants.

SAM WONG & SON, INC., Plaintiff,

v.

NEW YORK MERCANTILE EX-CHANGE, et al., Defendants.

Anthony SPINALE, Plaintiff,

v.

NEW YORK MERCANTILE EX-CHANGE, et al., Defendants.

Nos. 79 Civ. 3157, 81 Civ. 1239 and 81 Civ. 1964.

United States District Court, S.D. New York.

Sept. 29, 1983.

---

Charfoos, Christensen, Gilbert & Archer, P.C., Detroit, Mich., for plaintiffs Lyle Jordon, Ueal Patrick, and Frank Pancerz; John G. Konkel, Detroit, Mich., of counsel.

Greenstone & Greenstone, Newark, N.J., for plaintiff Sam Wong & Son; Wayne D. Greenstone, Newark, N.J., of counsel.

Newman, Tannenbaum, Helpern & Hirschtritt, New York City, for plaintiff Anthony Spinale; Vincent J. Syracuse, Richard A. Miller, and Cadwalader, Wickersham & Taft, Zwerling & Zwerling, New York City, of counsel.

Cahill, Gordon & Reindel, New York City, for defendants; William E. Hegarty, Henry G. Bisgaier, Peter Leight, New York City, of counsel.

Commodity Futures Trading Com'n, Washington, D.C., amicus curiae for CFTC; Dennis A. Dutterer, General Counsel, Pat G. Nicolette, Deputy General Counsel, Kenneth M. Raisler, Deputy General Counsel, Nancy E. Yanofsky, Attorney, Washington, D.C., of counsel.

Rein, Mound & Cotton, New York City, amicus curiae for New York Cotton Exchange; Maurice Mound, New York City, of counsel.

Kirkland & Ellis, Chicago, Ill., amici curiae for Bd. of Trade of the City of Chicago; Chicago Mercantile Exchange; Coffee, Sugar and Cocoa Exchange, Inc.; Commodity Exchange, Inc.; Minneapolis Grain Exchange; New Orleans Commodity Exchange; John E. Angle, T. Webster Brenner, John H. Stassen, Chicago, Ill., of counsel.

## OPINION AND ORDER

SOFAER, District Judge.

Plaintiffs in all three of these cases have sued the New York Mercantile Exchange ("Exchange"), various Exchange officers, and members of the Exchange's Board of Governors ("Board") in connection with emergency actions taken by the Exchange concerning the March, April, and May 1979 Maine-potato futures contracts. The Exchange provides facilities as well as an organizational structure for the trading of commodity futures contracts. Its activities are authorized and regulated by the Commodity Futures Trading Commission ("CFTC"), pursuant to the Commodity Exchange Act, 7 U.S.C. §§ 1–24 ("CEA"). Among the standardized contracts traded on the Exchange in 1979 were three that respectively provided for delivery in March, April, and May of 50,000 pounds of potatoes from the 1978 Maine crop. Plaintiffs in these three cases allege that as holders of positions in these 1979 Maine-potato contracts they were injured by certain actions and inactions of defendants. For the reasons that follow, the complaint in *Wong* is dismissed under Fed.R.Civ.P. 12(b)(6), and defendants are awarded summary judg-

ment under Fed.R.Civ.P. 56 in *Jordon, Spinale,* and alternatively in *Wong.*

## I. *Factual Background*

Commodities futures contracts are instruments whereby parties agree respectively to sell and to buy a particular commodity at a future date. Except for price, the terms of such a contract, such as amount of commodity, place and time of delivery, and exact grade or type of commodity, are fixed by the commodities exchange on which the contract is traded. The contracts involved in this case, providing for delivery of 50,000 pounds of Maine-grown potatoes in March, April and May 1979, also required that the potatoes be U.S.-No.-1 grade and that all shipments pass USDA inspections at both the designated point of origin and the designated point of destination. A variation in the April and May contracts permitted delivery of commercial-grade potatoes at a 25% discount off the contract price.

The manner in which commodity futures contracts are traded is detailed in Judge Friendly's opinion in *Leist v. Simplot,* 638 F.2d 283, 286–88 (2d Cir.1980), *aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982). For present purposes, however, it should be emphasized that the vast majority of futures contracts are never performed by the actual delivery and acceptance of a commodity. Rather, most persons holding contracts to buy or to sell a commodity satisfy their contractual obligations by acquiring opposite contracts before the date of delivery arrives. Through a mechanism provided by the commodities exchange on which the particular contract is traded, an individual's buy and sell obligations are matched and used to offset each other so that the individual need only pay the difference, if any, between the price of his initial position and the price of his offsetting position. Thus, if a trader acquired a contract to sell potatoes at $5 and thereafter he acquired a contract to buy potatoes at an increased price of $6, he would not be obligated to sell or buy anything; he would, however, owe the commodities exchange $1, the difference between the price at which he obligated himself to sell and the higher price at which he acquired an offsetting obligation to buy. On the other hand, if the trader had first acquired a contract to buy at $5 and had later acquired an offsetting contract to sell at $6, then he would be owed $1, the difference between the price at which he agreed to buy and the higher price at which he later agreed to sell. In the first case the trader is said to have taken a "short" position by agreeing to sell with the expectation that the price of the futures contract would decline; in the second case the trader is said to have taken a "long" position by agreeing to buy with the expectation that the price would increase.

■ There are two basic types of commodity futures traders, hedgers and speculators. Hedgers are producers and consumers of a particular commodity who wish to protect themselves against adverse fluctuations in the price of that commodity. For example, a potato grower might hedge against possible declines in the future price of his crop by acquiring short positions in a potato futures contract. If the price of potatoes thereafter declines, the producer's losses as a potato grower will be offset by his gains as a commodities trader holding a contract to sell at a previously fixed price. On the other hand, a consumer of potatoes, such as a potato-processing company, might hedge against possible increases in the future price of its raw material by acquiring long positions in a potato futures contract. If the price of potatoes does increase, the processor's losses as a potato buyer will be offset by its gains as a trader holding a contract to buy at a price fixed before the increase. Persons involved in futures trading who lack any underlying interest in actual commodities and who trade only for investment profit are known as speculators. Although the line between hedging and speculation is sometimes blurred, the primary economic function of commodity futures trading is to provide a hedging mechanism for producers and consumers, not a business opportunity for investors. Speculators nonetheless play an important role in facilitating the hedging function by creating efficient, liquid markets, *see* 1 P. Johnson, *Commodities Regulation* § 1.14 (1982),

and the CEA does not discriminate between hedgers and speculators in seeking to protect all commodities traders against fraudulent and deceptive practices, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 389, 102 S.Ct. 1825, 1844, 72 L.Ed.2d 182 (1982).

The plaintiffs in the three cases under consideration held different positions in the 1979 Maine-potato contracts for different purposes. Plaintiff Anthony Spinale ("Spinale") held a long position in the contracts, that is, he had agreed to buy potatoes in March, April, and May 1979 at prices set at the time his contracts were purchased on the floor of the Exchange. Spinale therefore hoped to profit by an increase in the price of Maine potatoes over those prices at which he had agreed to buy. He claims that defendants illegally prevented the prices of the potato contracts from increasing, thereby depriving him of substantial profits. Plaintiffs Lyle Jordon, Ueal Patrick and Frank Pancerz ("Jordon"), and Sam Wong & Son, Inc. ("Wong") held short positions in the contracts, that is, they had agreed to sell potatoes in March, April, and May 1979 at prices set at the time their contracts were purchased on the floor of the Exchange. These plaintiffs therefore hoped to profit by a decline in the price of the futures contracts below the prices at which they had agreed to sell. They claim that defendants either illegally caused the prices of the potato contracts to rise, or illegally neglected to limit that rise, thereby causing or substantially increasing the losses they suffered. Spinale and Jordon were speculators trading for investment profit. Wong, on the other hand, is an Idaho-potato grower that acquired short positions in the 1979 Maine-potato contracts to hedge against a decline in the value of its crop.

The plaintiffs' claims stem from extraordinary developments in early March 1979. Between March 5 and March 8, 1979, 29 of 32 deliveries of Maine potatoes under the March 1979 contract failed to make the required U.S.-No.-1 grade at destination inspections at Hunts Point Terminal Market in Bronx, New York, after having been graded U.S. No. 1 at point-of-origin inspections in Presque Isle, Maine. Defendants maintain that this failure rate resulted from a problem in the quality of the 1978 Maine potato crop. *See* Report of CFTC Division of Trading and Markets Re: New York Mercantile Exchange Temporary Emergency Action of March 8, 1979 at II–7 to II–22 (Feb. 1, 1980) ("CFTC Report"). Spinale does not deny that poor crop quality caused the inspection failure; indeed, he claims that the poor quality of the 1978 crop had led him to invest in long futures positions. Affidavit of Anthony Spinale ¶¶ 5–6 (Nov. 12, 1982). The "short" plaintiffs, Jordon and Wong, appear to allege, without any specificity, that the failures may have been caused by a conspiracy of unidentified individuals intent on driving up the price of the Maine-potato contract. *See Jordon* Amended Complaint ¶ 36; *Wong* Amended Complaint ¶ 56.

Whatever its cause, the high failure rate resulted in higher prices for the April and May contracts as news of the possibility of a shortage of deliverable Maine potatoes spread in the market; at the same time, persons holding March contracts obligating them to sell were faced with the difficulty of producing at Hunts Point the gradable Maine potatoes needed to meet their commitments. Meanwhile, the cash-market price of potatoes—which potato-futures prices should normally approach as dates of delivery draw near—did not rise, because the market price was based on potatoes from all sources, not just Maine potatoes, and was thus only marginally affected by information concerning a potential shortfall in the supply of top-quality Maine potatoes. By close of trading on March 8, the prices of the April and May contracts had reached respectively $7.60 and $8.14 per hundredweight ($3800 and $4070 per contract), while the cash price of comparable, non-Maine potatoes at Hunts Point remained steady at $5.85 per hundredweight. *See* CFTC Report at II–7 to II–24. In response to the market crisis that resulted from this divergence in prices, the Board, at a meeting held between approximately 9:15 p.m. and 4:30 a.m. on March 8–9, declared that a market emergency existed with respect to the March, April, and May 1979 Maine-pota-

to contracts; suspended trading in the April and May contracts; and ordered those contracts liquidated at the March 8 settlement price. The Board also ordered a two-day extension in the delivery period for March contracts, and provided that unfulfilled March contracts would be settled at a price determined by a special committee. *See* CFTC Report at II–32 to II–34.

The complaints in these three cases all ultimately focus on the legality of the defendants' conduct in connection with the claimed emergency, although Wong also raises a unique claim dealing with the Exchange's failure to propose amendments to its basic potato contract. Defendants' motions to dismiss and for summary judgment on the complaints involve questions of law that are central to the CEA's application in private actions against commodities exchanges. The CFTC was therefore invited to file a statement of its position on these issues, which it has done. Thereafter, the Exchange, and several other commodities exchanges appearing *amicus curiae,* filed responses to the CFTC's brief, taking issue with some of the CFTC's proposed standards.

 The questions raised by the parties need not all be answered in these cases. For the reasons that follow, however, three principles are held to govern the present motions, and these principles warrant dismissal of all the claims alleged against Exchange defendants. First, to withstand a motion to dismiss a complaint that challenges any type of exchange action authorized by the CEA or the CFTC's regulations, a plaintiff must allege that the exchange conduct was in bad faith, or that the exchange knowingly permitted illegal activity to occur, despite its having had clear authority to curb such activity. Second, to withstand a motion for summary judgment, a plaintiff must do more than merely allege bad faith or knowing nonfeasance; the plaintiff must submit evidence sufficient in light of the other evidence presented to raise a genuine issue of material fact on the ultimate question of law. Third, concerning Wong's claim that defendants failed to propose potato-contract amendments, any exchange duty to propose or make changes

in traded contracts is enforceable only through the administrative process, and therefore creates no rights to sue for damages, absent an exchange's failure to abide by orders of the CFTC or the courts; even assuming, however, the existence of an extra-administrative, privately enforceable duty to propose amendments, such a duty would be governed by the same bad-faith standard governing highly discretionary exchange actions, and Wong's allegations fail to satisfy this standard.

## II. Standard of Liability for Commodities Exchanges

The standard of liability for commodities exchanges was expressly left undecided by the Supreme Court when it held that a private right of action against an exchange is implied by the CEA. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 395, 102 S.Ct. 1825, 1848, 72 L.Ed.2d 182 (1982). The Futures Trading Act of 1982, Pub.L. No. 97–444, 96 Stat. 2294 (1983) ("1982 Amendments"), recently created § 22(b)(4) of the CEA, which provides that private actions against a commodities exchange or its officers and employees "must establish ... bad faith in failing to take action or in taking such action as was taken." The 1982 Amendments, however, also include § 22(d), which states that no provision of the 1982 Amendments shall "affect any right of any parties which may exist with respect to causes of action accruing prior to" enactment.

The CFTC maintains that, given § 22(d), "it is clear that the bad-faith standard of Section 22(b)(4) does not apply retroactively." CFTC Brief 9. It proposes for all suits based on conduct prior to the 1982 Amendments a "dual" standard of liability:

(1) A gross negligence or deliberate failure to act standard should be applied where it is alleged that an exchange has failed to comply with its continuing obligations of designation, such as those imposed by Sections 5(d) and 5a(8) of the Commodity Exchange Act, 7 U.S.C. §§ 7(d) and 7a(8); and

(2) A bad faith standard should be applied to the matters entrusted to the exchange's broad discretion and judgment, such as an exchange decision to declare or not to declare an emergency and decisions regarding actions to be taken in response to an emergency.

This proposed "dual" standard is, in reality, a triple standard. A material difference exists between "gross negligence" and a "deliberate failure to act." The former is a degree of negligence, and would give exchanges little more protection (if any) from suit and trial than an ordinary-negligence standard. The latter—"deliberate failure to act"—is a degree of bad faith, rather than of negligence, and the considerable authority recognizing a right to sue an exchange for deliberate failure to act makes clear that this standard is intended to require conduct akin to bad faith.

 The Commission correctly advocates a "bad faith" standard for all exchange actions that are discretionary, such as declaring an emergency and then taking steps to alleviate a market crisis. In these cases, the Exchange Board was fully authorized to declare an emergency and take the kinds of action it did. Exchange Bylaw 23 defines an emergency as "[a]ny occurrence or circumstance which, in the opinion of a governing body of the Exchange ... requires immediate action and threatens or may threaten such things as the fair and orderly trading in, or liquidation of, or delivery pursuant to, any contract for the future delivery of the commodity on the Exchange." Bylaw 23.14(B)(2); see Affidavit of Rosemary McFadden (July 22, 1982), Ex. C (submitted by defendants in Spinale). In the event of such an emergency, Bylaw 23 authorizes the Board, among other things, to order liquidation of contracts and fix a settlement price (Bylaw 23.-14(E)(1)(f)), to extend time for delivery (Bylaw 23.14(E)(1)(d)), and to suspend trading

(Bylaw 23.14(E)(1)(j)).[1] All these provisions were approved by the CFTC under § 5a(12) of the CEA, 7 U.S.C. § 7a(12); indeed, the relevant portions of Bylaw 23 are substantially similar to CFTC regulation 1.41(f)(3), 17 C.F.R. § 1.41(f)(3), which grants all commodities exchanges the power to promulgate temporary emergency rules without the CFTC's prior approval. Moreover, as persons who traded in one of the Exchange's futures contracts, all plaintiffs in these cases are presumed to have known of and accepted the Exchange's rules regarding emergency action. *See Crowley v. Commodity Exchange,* 141 F.2d 182, 188 (2d Cir.1944); *P.J. Taggares Co. v. New York Mercantile Exchange,* 476 F.Supp. 72, 77 (S.D.N.Y.1979).

Given the vast discretion inherent in making such determinations as when to declare an emergency and what to do about it, the courts have developed the rule that, "absent allegations of bad faith," a commodities exchange and its officials "may not be held for discretionary actions taken in the discharge of their duties pursuant to the rules and regulations of the [e]xchange." *P.J. Taggares Co. v. New York Mercantile Exchange,* 476 F.Supp. 72, 76 (S.D.N.Y.1979) (Weinfeld, J.) (cases collected). In *Taggares* the complaint alleged that the Exchange's increase in margin requirements for the May 1977 Maine-potato contract involved various violations of the CEA, the Sherman Act, and state common law. Judge Weinfeld dismissed the entire complaint for failure to allege that " 'bad faith amounting to fraud' " motivated the Exchange's action, 476 F.Supp. at 77 (quoting *Daniel v. Board of Trade,* 164 F.2d 815, 819 (7th Cir.1947)); and "bad faith," Judge Weinfeld stated, "means ulterior motive, for example, personal gain," 476 F.Supp. at 77 n. 22. Similarly, in *Compania de Salvadorena de Cafe, S.A. v. Commodities Futures Trading Commission,* 446 F.Supp. 687

---

1. The *Jordon* plaintiffs' claim that "termination" of trading in May contracts was not authorized because Bylaw 23 only allows a "suspension" of trading is meritless. *See* Amended Complaint ¶ 33. The broad range of actions listed in both Bylaw 23 and CFTC regulation 1.41, 17 C.F.R. § 1.41, precludes such a narrow interpretation of the authority granted to suspend trading in a contract. Although "suspend" may connote temporary action, Bylaw 23's reference to suspension of trading, in the context of granting broad emergency powers, readily encompasses permanent as well as temporary suspension.

(S.D.N.Y.1978), Judge Lasker dismissed a complaint alleging that the emergency actions of an exchange violated federal law, because the complaint lacked the necessary allegations of bad faith. "The discretion of the Board [of the New York Coffee and Sugar Exchange] to declare and meet an emergency ... is without limit except that the Board must act in good faith." 446 F.Supp. at 691.

In *Taggares* Judge Weinfeld initially analogized this standard to the business judgment rule, a principle applied in cases dealing with allegedly negligent business decisions by corporate officers and directors. 476 F.Supp. at 76. As indulgent as that rule may be, however, the standard ultimately stated in *Taggares*—bad faith amounting to fraud—suggests that the bad-faith standard is intended to be even more protective of exchange actions than the business judgment rule.[2] The Second Circuit expressly recognized the need to protect exchange-board members from unspecified and insubstantial claims of self-interest in *Crowley v. Commodity Exchange,* 141 F.2d 182 (2d Cir.1944), involving an exchange board's selection of a liquidation price for silk futures following a government-requested closing of the silk-contract markets. In rejecting the plaintiff's claims based on the self-interested nature of some of the votes in favor of the chosen price, the Circuit Court emphasized that the plaintiff "when it undertook to do business through the Exchange, would expect to deal with those favoring either short or long interests, if not both." 141 F.2d at 188. Moreover, the Court refused to assume that board members necessarily voted in favor of their firms' customers' positions. Such an assumption would conflict with the fact that "[i]n order that the Exchange might choose for its officers men who were qualified by knowledge and experience, it must necessarily take members active in trading." *Id.; see also Bishop v. Commodity Exchange, Inc.,* 564 F.Supp. 1557, 1562 (S.D.N.Y.1983) (Lasker, J.) (suits against exchanges require "careful refinement of the pleadings" because exchange-board members "are called upon, on occasion, to vote on matters which ... relate to the industry from which [they] derive [their] livelihood."). Of course, since *Crowley,* the Seventh Circuit's decision in *Daniel v. Board of Trade,* 164 F.2d 815 (7th Cir.1947) established that the bad-faith standard requires exchange boards to act in emergencies "with the utmost objectivity, impartiality, honesty, and good faith," in part because board members "may themselves be members of the market, and as such have to act where their own private interests are concerned." 164 F.2d at 820. Purely self-interested decisions could not be excused as the result of a fair struggle between the "long" and "short" interests on an exchange board, but since self-interest would inevitably appear to taint exchange-board decisions, the "utmost objectivity" rule entitled plaintiffs to recover damages only by

---

**2.** The Second Circuit recently characterized the business judgment rule as embodying a judicial reluctance to impose liability "upon corporate directors or officers simply for bad judgment." *Joy v. North,* 692 F.2d 880, 886–87 (2d Cir. 1982). Judge Winter discussed three rationales for this reluctance. "First, stockholders ... voluntarily undertake the risk of bad business judgment [by choosing stock ownership in a particular corporation] .... Second, courts recognize that after-the-fact litigation is a most imperfect device to evaluate corporate business decisions.... Third, because potential profit often corresponds to the potential risk, it is very much in the interest of shareholders that the law not create incentives for overly cautious corporate decisions." The applicability of these rationales to the emergency actions of an exchange board is sufficient to confirm that the bad-faith standard is at least as protective of exchange-board decisions as the business judgment rule is of the decisions of officers and directors of a profit-making corporation. Furthermore, unlike the officers and directors of a profit-making corporation, an exchange board is called upon to exercise quasi-governmental regulatory authority in situations where its decisions will necessarily favor the interests of one group over another. Indeed, with suits brought by both "long" and "short" traders, this litigation illustrates the problems faced by exchange boards in exercising their discretionary authority over the conduct of futures trading, an authority Congress has sanctioned and encouraged. *See* S.Rep. No. 1131, 93d Cong.2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad. News 5843, 5859; *Curran,* 456 U.S. at 382, 102 S.Ct. at 1841; 1 P. Johnson, *Commodities Regulation* § 2.85 (1982).

proving "such infidelity . . . as to amount to fraud." *Id.*

■ More recently, the Second Circuit expressly recognized that the bad-faith standard requires proof of virtually fraudulent conduct. In *Miller v. New York Produce Exchange,* 550 F.2d 762 (2d Cir.1977), the Court affirmed the trial court's directed verdict for exchange defendants on claims that the trial court had determined were governed by the bad-faith standard.[3] The case involved various emergency actions taken in connection with the discovery of a major swindle in the salad-oil market. In affirming the directed verdict, the Circuit Court noted the absence of proof both of exchange knowledge of the swindle and of any ulterior motives for the emergency actions eventually taken. In finding plaintiff's circumstantial evidence insufficient, the Second Circuit specifically relied on cases involving allegations of fraudulent conspiracy, and repeatedly emphasized the need for substantial evidence supporting more than mere suspicion, conjecture, or speculation. "The purported fact issue must be actual rather than theoretical, real rather than imaginary; it requires more than a scintilla or modicum of conflicting evidence." 550 F.2d at 767 (citations omitted). In order, therefore, to create an issue of fact concerning exchange bad faith, a plaintiff must demonstrate the existence of a conflict of interest substantially greater than that which inevitably "taints" the decisions of self-regulating exchange boards.

The Commission is, however, also correct in contending that the strict, bad-faith standard that governs exchange liability for discretionary decisions, such as declarations of emergency, may be modified in some circumstances. A line, albeit imprecise, can be drawn between some highly discretionary functions, and some of the less discretionary, continuing obligations imposed on exchanges by the CEA. Distinctions between these types of functions are often illusory, however, and at most they justify

that aspect of the Commission's suggested, "dual" standard that imposes liability on an exchange for knowing failures to perform acts or functions assigned to the exchange by the CEA, which result in consequences the exchange had the power and responsibility to prevent. The paradigmatic case in which such liability may exist is where an exchange knowingly fails to enforce rules designed to control the behavior of its members. In *Strax v. Commodity Exchange, Inc.,* 524 F.Supp. 936 (S.D.N.Y.1981), for example, the plaintiff claimed that the defendant exchange was liable for negligently failing to maintain an orderly market while certain other defendants monopolized and manipulated prices in silver futures. The District Court held that the allegation of negligent failure to maintain an orderly market did state a cause of action, given the further allegation that the exchange had failed to control a conspiracy to monopolize and manipulate. 524 F.Supp. at 943. To the extent the Court concluded that an allegation of negligence is sufficient to state a cause of action, that conclusion seems based upon an untenable reading of the decision in *Leist, supra.* *See id.; see also Gordon v. Hunt,* 558 F.Supp. 122 (S.D. N.Y.1983) (Lasker, J.) (Supreme Court's decision in *Curran* "could well be argued to authorize suit on a less restrictive basis" than the bad-faith standard.); *Apex Oil Co. v. DiMauro,* 82 Civ. 1796 (S.D.N.Y. July 29, 1983) (Owen, J.) (applying negligence standard in reliance on *Strax*). *But see Bishop v. Commodity Exchange, Inc.,* 564 F.Supp. 1557 (S.D.N.Y.1983) (Lasker, J.) (motion to dismiss complaint against a commodities exchange denied without reference to negligence standard). The Second Circuit in *Leist* did not discuss standards of care under an implied CEA right of action, nor were such issues presented for its decision on appeal; and in *Curran* the Supreme Court expressly reserved the question of what standards of care might govern pri-

---

**3.** Insofar as the District Court had allowed claims relating to an alleged failure to control manipulation to go to the jury on a modified negligence charge, *see* 550 F.2d at 766, the Second Circuit ruled that the jury verdict for

defendants' obviated the need "to consider defendants' argument that their duties were less onerous than as described by the District Court." 550 F.2d at 767.

vate suits under the CEA, 456 U.S. at 395, 102 S.Ct. at 1848.

■ The *Strax* Court's suggestion, however, that an exchange may be held liable for negligent inaction in the face of known or obvious member misconduct was well supported. *See Deaktor v. L.D. Schreiber & Co.,* 479 F.2d 529, 530, 534 (7th Cir.), *rev'd on other grounds sub nom. Chicago Mercantile Exchange v. Deaktor,* 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973); *Pollock v. Citrus Associates of the New York Cotton Exchange,* 512 F.Supp. 711, 712, 713 (S.D.N.Y.1981); *Taggares,* 476 F.Supp. at 78; *Smith v. Groover,* 468 F.Supp. 105, 118 (N.D.Ill.1979); *Seligson v. New York Produce Exchange,* 378 F.Supp. 1076 (S.D.N.Y. 1974), *aff'd on other grounds sub nom. Miller v. New York Produce Exchange,* 550 F.2d 762 (2d Cir.), *cert. denied,* 434 U.S. 823, 98 S.Ct. 68, 54 L.Ed.2d 80 (1977). These decisions and the policies on which they are based do not, however, justify a general exception to the bad-faith standard for negligent—even grossly negligent—exchange "nonfeasance" as opposed to "misfeasance". Where an exchange knows or should know of wrongful market conduct that it is empowered and required to control, a nondiscretionary duty to take some action arises, and the failure to satisfy that duty constitutes conduct amounting to a bad-faith exercise of the exchange's statutory responsibilities. *Cf. Baird v. Franklin,* 141 F.2d 238, 239 (2d Cir.) (under § 6 of the Securities Exchange Act, 15 U.S.C. § 78f, securities exchange is liable for failure to enforce its rules only where exchange has notice of member violations), *cert. denied,* 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591 (1944); *Marbury Management, Inc. v. Alfred Kohn, Wood, Walker & Co.,* 373 F.Supp. 140 (S.D. N.Y.1974) (same); *see* Transcript of November 4, 1982 Oral Argument at 72.

One may properly contend that holding an exchange liable for a knowing failure to perform a required act is entirely consistent with the bad-faith standard, and avoids the dangers of any departure from bad faith that truly would constitute a "dual standard." A general rule that measured exchange "nonfeasance" by a negligence or even gross-negligence standard would often present difficult problems in distinguishing action from inaction. In this case, for example, the Exchange's allegedly improper emergency measures could be characterized as negligent "inaction" to the extent they were taken too late or were too mild a response to the delivery-failure situation. Furthermore, a rule which generally afforded less protection to exchange "inaction" would arbitrarily encourage concrete "action" in response to a variety of situations where, but for the varying standards imposed by law, inaction might be a more appropriate response. Knowing inaction, on the other hand, may constitute bad faith even by the standard that will govern actions against exchanges under § 22(b)(4) of the CEA, which, as noted, was recently enacted by the Futures Trading Act of 1982, Pub.L. No. 97–444, 96 Stat. 2294 (1983), and which expressly provides a private cause of action against a commodities exchange only insofar as the exchange's bad-faith action or inaction violates the CEA.

■ The CFTC's argument that § 22(b)(4) must be ignored is untenable. The new section strongly suggests the impropriety of judicially authorizing, at this point in time, causes of action based on concepts of liability radically broader than bad faith. In *Bradley v. School Board,* 416 U.S. 696, 715 n. 21, 94 S.Ct. 2006, 2018 n. 21, 40 L.Ed.2d 476 (1974) the Supreme Court stated that "[w]here Congress has expressly provided . . . that legislation was to be given only prospective effect, the courts . . . generally have followed that lead," but this statement hardly lays down a firm rule against judicial consideration of the impact of such legislation on pending cases. Although § 22(d) provides that § 22(b)(4) does not affect any rights accruing prior to enactment, the new provision's policy in favor of a broad application of the bad-faith standard is a relevant consideration where accrued rights have not yet been identified. An implied, private right of action is a device which the courts are charged with shaping, *see Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 737, 95 S.Ct. 1917, 1926, 44 L.Ed.2d 539 (1977), but in

"implying" private rights of action courts should focus primarily on indications of congressional intent, see *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Curran,* 456 U.S. at 377–78, 102 S.Ct. at 1838–39 (cases collected). Thus, the plain desires of Congress concerning a formerly implied, now express, right of action should be accorded great weight, absent some evidence that Congress previously meant, or that the courts previously understood Congress to mean, otherwise. As counsel for the Exchange perceptively observes: "The policies which Congress viewed as governing private damage actions against contract markets in 1982 are obviously no different from the policies governing an action which accrued in 1979." Defendants' Memorandum In Response To CFTC Brief 10. Indeed, even in the area of judicial interpretation of superceded but still litigated statutes, reference to the congressional choices indicated by the superceding enactments has been approved, see *In re Texlon Corp.,* 596 F.2d 1092, 1098 (2d Cir.1979) (new Bankruptcy Code), particularly where the need for judicial interpretation was created in part by the ambiguities of prior opinions, see *Rohauer v. Killiam Shows, Inc.,* 551 F.2d 484, 494 (2d Cir.) (new Copyright Act), *cert. denied,* 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977).

### III. Application of the Liability Standard to the Exchange's Actions

The complaints and the evidence presented by plaintiffs on defendants' motions to dismiss and for summary judgment do not satisfy the bad-faith standard, even as read to include liability for knowing or constructively knowing failure to control improper market activities.

#### A. Wong

Unlike the complaints in *Spinale* and *Jordon,* the Amended Complaint in *Wong* does not expressly focus on the emergency action taken by the Board. Rather, Wong alleges CEA and antitrust violations involving the Exchange's long-term failures (1) to regulate adequately trading in the March, April, and May 1979 potato contracts (Counts 5 and 7–10), and (2) to amend the terms of the basic potato contract, despite the contract's alleged deficiencies as a hedging device (Counts 1, 3, and 4). Only Wong's claims concerning inadequate regulation of 1979 contract trading will be addressed here; the failure-to-amend claim is addressed below.

Wong's allegations of failure to regulate adequately are closely linked to the Board's emergency action. To focus on inadequate regulation as opposed to emergency actions taken does not permit application of a standard other than bad faith. A characterization of the Board's activities (or inactivities) which avoids reference to the emergency action taken cannot avoid application of the bad-faith standard to those activities (or inactivities), given their close relation to emergency action governed by the bad-faith standard. Moreover, the *Wong* complaint does not allege Exchange inactivity in the face of actual or constructive knowledge of market manipulation. The Sixth Count claims the existence of a conspiracy of unnamed corporations and individuals to increase prices in the potato-futures market through manipulation. Count Seven refers to the conspiracy alleged in Count Six, but only in connection with the Exchange's alleged inaction and failure "adequately to investigate and monitor the market place." Complaint ¶ 59. No allegation is made that the Board knew or should have known of this alleged but undetailed conspiracy.

The Eighth, Ninth, and Tenth Counts of the *Wong* complaint explicitly refer to the emergency measures taken by the Board and allege that they were violations of various provisions of the CEA and the antitrust laws. In an apparent effort to avoid the bad-faith standard, even these allegations overtly dealing with the emergency action are cast in terms of failures "to act before cash and futures prices diverged," "to investigate whether less drastic action could be taken," and "to maintain an orderly market." Complaint ¶ 67. These attempts to avoid the bad-faith standard illustrate the incentive to artful pleading that exists so long as exchanges are subject to bifurcated standards of conduct that depend on the nature of the alleged violations of the CEA.

■ The narrow exception to the bad-faith standard for implied actions against exchanges is limited to cases involving bona fide allegations of an exchange's inaction in the face of actual or constructive knowledge of wrongful market activities. As discussed, these forms of conduct so often suggest the existence of bad faith that a lessening of the nominal standard of care is warranted, and supported by prior decisions. In applying this broad, bad-faith standard, however, its justification and consequently limited nature must be considered. The *Wong* complaint nowhere meaningfully alleges the existence of improper market activity of which the Exchange knew or should have known. Thus, notwithstanding the somewhat wider focus of the allegations in *Wong*, the alleged defaults of the Exchange in connection with the 1979 potato contract ultimately revolve around the emergency actions taken in early March 1979, and must be judged by the bad-faith standard. Wong has properly conceded that its complaint does not allege bad faith amounting to fraud. *See Wong* Plaintiff's Memorandum In Opposition 5; Transcript of November 24, 1982 Oral Argument ("Transcript") at 63–64.[4] Wong's allegations concerning the adequacy of the Exchange's regulation of potato-contract trading are thus deficient as a matter of law.

### B. *Jordon*

The *Jordon* complaint is clearly focused on the Board's emergency action. Amended Complaint ¶¶ 30–35. Paragraph 36 of the complaint alleges that persons unknown to plaintiffs but known to defendants intentionally manipulated the potato-futures market by creating "an artificial condition to reflect an insufficient availability of contract specification potatoes." The complaint fails, however, to allege that the Board knew of or knowingly failed to control this undescribed manipulation. The remainder of the *Jordon* complaint plainly relates only to the emergency action taken by the Board and is therefore subject to the bad-faith standard. For the reasons stated below in connection with the *Spinale* complaint, the *Jordon* complaint cannot avoid the bad-faith standard by characterizing the Exchange's emergency measures as violations of various provisions of the CEA and antitrust laws.

Unlike Wong, the *Jordon* plaintiffs do not concede that their complaint fails to allege the necessary bad faith. Transcript at 70. Their papers, however, deal almost exclusively with whether bad faith need be claimed at all, *see Jordon* Plaintiffs' Supplemental Memorandum (Dec. 23, 1982); *Jordon* Plaintiffs' Brief In Response to CFTC Brief (March 14, 1983), and at oral argument *Jordon* plaintiffs' counsel asserted "our position is basically that the bad-faith standard is not the standard to be followed." Transcript at 69. The *Jordon* complaint nonetheless does allege a "fraudulent" "conflict of interest" involving three named members of the Exchange Board who, plaintiffs claim, held and executed for others short positions in the 1979 Maine potato contract. Amended Complaint ¶¶ 48–57.

---

4. Judge MacMahon recently concluded that Fed.R.Civ.P. 9(b)'s particularity requirement does not apply to allegations of commodities-exchange bad faith. *See Strobl v. New York Mercantile Exchange*, 561 F.Supp. 379 (S.D.N.Y.1983). As a matter of first impression, the question whether allegations of exchange bad faith are more similar to "fraud and mistake" (which rule 9(b) requires to be stated with particularity) or to "malice, intent, knowledge, or other condition of mind" (which rule 9(b) allows to be averred generally) may be close. But the seminal decision in *Daniel v. Board of Trade*, 164 F.2d 815, 820 (7th Cir.1947), and Judge Weinfeld's opinion in *Taggares v. New York Mercantile Exchange*, 476 F.Supp. 72, 77 (S.D.N.Y.1979), provide persuasive authority for the application of rule 9(b)'s particularity requirement. Given the vulnerability of exchange boards to suits by disgruntled traders able to aver the general existence of a degree of board self-interest, a particularity requirement is needed to enable the early disposition of meritless suits. *See Segal v. Gordon*, 467 F.2d 602, 606–07 (2d Cir.1972) (rule 9(b) designed to protect defendants from charges of serious wrongdoing in situations where strike suits are likely); *see also Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 119–21 (2d Cir.1982). The bad-faith allegations in *Strobl* may in fact have satisfied rule 9(b)'s particularity requirement.

■ These allegations are insufficient to support a claim of Exchange bad faith. A threshold difficulty is that the alleged "conflicts" place the named Board members on the same, short-selling side of the potato-futures market as the *Jordon* plaintiffs, who seek to represent the entire class of persons holding net-short positions in the May potato contract on March 8, 1979. *See* Amended Complaint ¶ 15; Affidavit of Jared P. Buckley, Esq. ¶ 3 (Sept. 14, 1979). Moreover, Jordon fails to allege specifically that a conflict of interest actually influenced the decisions of the three named Board members; their mere, simultaneous execution of potato-contract trades is plainly insufficient, or no broker could serve effectively on an exchange board. *See* Amended Complaint ¶ 50. Finally, the votes of the three named Board members were not necessary to the decisions reached at the March 8–9, 1979 meeting. *See* Affidavit of Howard Gabler ¶ 4 (Sept. 5, 1979); *see also infra* note 8. The allegedly fraudulent conflicts thus could not be deemed either to have caused plaintiffs' harm or to have tainted the actions of the entire Board.

■ In any event, Jordon's bad-faith allegations lack any substantial evidentiary basis. All of the named Board members have submitted affidavits denying both that they held net-short positions in the 1979 potato contract and that, to the extent they executed any trades, they executed trades exclusively on either the short or long side of the market. *See* Affidavit of Sal Calcaterra (Sept. 5, 1979); Affidavit of Jack Place (Sept. 5, 1979); Affidavit of Stanley Meierfeld (Sept. 5, 1979). Affida-

vits submitted in September 1979 by plaintiffs' prior counsel attempt to rebut these documents with little more than assertions of a "continuing investigation" and "information and belief." *See* Affidavits of Jared P. Buckley, Esq. (Sept. 14, 1979). At oral argument, plaintiffs' present counsel represented that the conflict allegations were "based on information and belief . . . of an investigator." Transcript at 70. The Court then instructed counsel to submit affidavits supporting the information and belief of the unnamed investigator within thirty days, at which time the Court would deem the record closed for purposes of treating defendants' motion to dismiss as a motion for summary judgment. Transcript 71–72; *see* Fed.R.Civ.P. 12(b) (submission of matter outside the pleading converts rule 12(b)(6) motion into rule 56 motion). Plaintiffs have failed to submit evidence in response to the Court's invitation.[5] Therefore, allowing plaintiffs the too-generous assumption that their complaint sufficiently alleges bad faith, defendants are granted summary judgment. Fed.R.Civ.P. 56; *see Moss v. Morgan Stanley Inc.,* 553 F.Supp. 1347, 1364–65 (S.D.N.Y.1983).

### C. *Spinale*

The complaint in *Spinale* is also focused on the Exchange Board's emergency action. Amended Complaint ¶¶ 17–25. At some points in the complaint, Spinale appears to allege a failure to control wrongful conduct which, as noted, may be governed by a more inclusive bad-faith standard. For example, ¶ 59(c) of the complaint alleges that the Exchange knowingly failed to prevent dis-

---

**5.** In an affidavit dated December 23, 1982 the *Jordon* plaintiffs' counsel informed the Court that plaintiffs' investigator, one Michael Gavin, had been contacted, but that Mr. Gavin "did not remember the exact details of his investigation" and would not be able to review records kept in counsel's Detroit office for thirty days. Affidavit of John G. Konkel, Esq. (Dec. 23, 1982). To date no affidavit concerning Mr. Gavin's investigation has been filed with the Court. Plaintiffs describe the requirement of bad-faith allegations which must be specifically pled under Fed.R.Civ.P. 9(b), *see supra* note 11, as a "Catch 22" insofar as specific fraud claims are difficult to aver absent discovery. *Jordon*

Plaintiffs' Brief In Response to CFTC Brief 2. This argument overlooks the fact that rule 9(b) is designed to deny discovery on fraud claims absent prior knowledge which would permit specific charges. "A complaint alleging fraud should be filed only after a wrong is reasonably believed to have occurred; it should serve to seek redress for a wrong, not to find one." *Segal v. Gordon,* 467 F.2d 602, 607–08 (2d Cir. 1978). As Judge Lasker put it, "[c]omplaints should not be conceived merely as tokens, guaranteeing access to a world of discovery." *Denny v. Barber,* 73 F.R.D. 6, 10 (S.D.N.Y. 1976) (relying on *Segal* ), *aff'd,* 576 F.2d 465 (2d Cir.1978).

semination of false reports concerning Maine potatoes. The nature of these false reports is nowhere alleged, however, and given the complaint's focus on the Board's emergency action, it must be assumed that the "reports" alleged are simply the information and statements which the Board itself relied on or produced in declaring an emergency. Indeed, Spinale's papers characterize the ¶ 59 reports as "concerning the 'emergency'." *Spinale* Plaintiff's Supplemental Memorandum 5 (March 15, 1983). Thus, as with the *Jordon* allegation of a failure to control a conspiracy to create an artificial Maine-potato shortage, the allegation of a failure to control false information is a mirror-image of the claim concerning the emergency action, and cannot be judged by a standard separate from that used to judge the emergency action itself.

Furthermore, Spinale's attempt to evade the bad-faith standard by characterizing the emergency action as a fraud in violation of § 4b of the CEA, 7 U.S.C. § 6b; a failure to enforce the rules of the potato contract in violation of § 5a(8) of the CEA, 7 U.S.C. § 7a(8); and a price manipulation in violation of § 9(b) of the CEA, 7 U.S.C. § 13(b), cannot succeed. *See Spinale* Plaintiff's Memorandum 16–26 (Nov. 15, 1982) & Supplemental Memorandum 3–7 (March 15, 1983). Many emergency actions could be characterized as fraud, failure to enforce contract terms, or price manipulation, but for the fact that emergency actions are authorized by § 5a(12) of the CEA, 7 U.S.C. § 7a(12), and CFTC regulation 1.41, 17 C.F.R. § 1.41, as well as Exchange Bylaw 23. The threshold question is whether the emergency action was taken in good faith and was thus permissible under the CEA as emergency action, not whether such action could be characterized in the abstract as a CEA violation. *See Lagorio v. Board of Trade*, 529 F.2d 1290, 1292 (7th Cir.) (action taken in the good-faith exercise of an exchange's regulatory duties cannot be characterized as market manipulations), *cert. denied*, 426 U.S. 950, 96 S.Ct. 3171, 49 L.Ed.2d 1187 (1976). Similarly, Spinale's antitrust-conspiracy characterization of the March 8 emergency action, *see* Amended Complaint ¶¶ 27–33, cannot be used to avoid the bad-faith standard. *See Seligson v. New York Produce Exchange*, 378 F.Supp. 1076, 1104 (S.D.N.Y.1974) ("The entire regulatory scheme administered by the Exchange would constitute a restraint of trade ... were it not for the limited immunity to antitrust challenge necessary to effectuate an otherwise contradictory Congressional Act."), *aff'd sub nom. Miller v. New York Produce Exchange*, 550 F.2d 762 (2d Cir.), *cert. denied*, 434 U.S. 823, 98 S.Ct. 68, 54 L.Ed.2d 80 (1977).

Spinale has made a substantial effort to withstand summary judgment on the issue of bad faith by submitting to the Court a variety of affidavits and exhibits, but these papers fail to raise a genuine issue of fact concerning the bad faith Spinale must show to recover from Exchange defendants.

(1) *Allegations In the Complaint*. Apart from a number of undetailed and wholly conclusory allegations of the Board's fraud and bad faith, *see* Amended Complaint ¶¶ 35–38, 42, 43, 51, 59, 81, Spinale's complaint outlines two relatively specific theories. The Seventh Claim for Relief, Amended Complaint ¶¶ 70–79, alleges that virtually all members of the Board were affiliated with Exchange clearing member firms that, in the event of a default by holders of short positions in the 1979 potato contracts, would have been required to guarantee the profits of the potato-contract "longs". Spinale further asserts that, had any "short" customers failed to meet their margin requirements as prices for the April and May contracts rose, the clearing firms with whom the Board members were affiliated would have been required to cover the required margins themselves. The complaint thus concludes that all Board members holding shares in, or in any way employed by, clearing firms were sufficiently interested in the emergency action taken on March 8–9, 1979 that their failure to disqualify themselves constituted an act of bad faith. The Sixth Claim for Relief, Amended Complaint ¶¶ 62–69, alleges that an unspecified number of Board members "controlled, advised, and/or had a financial interest in short positions respecting Potato Futures Contracts held in the names of their friends, relatives, employees, nomi-

nees, partners, stockholders, business associates, agents or customers." Spinale claims that, given these short positions, Board members and their various cohorts "would have suffered substantial economic losses" had the Board not taken emergency action which forstalled both delivery defaults by March contract "shorts" and a drastic appreciation in the price of the April and May contracts. Thus, Spinale alleges, the emergency actions were taken in a bad-faith effort to preserve the assets of Board members and their "short" friends, relatives, and associates.

■ (a) *Obligations of clearing member firms.* The self-interest alleged in connection with clearing member firms' obligation to guarantee "long" profits in case of default is insufficient. Under Exchange rule 41.06 clearing member firms' must contribute to a fund to be used to reimburse the Exchange in the event an individual clearing member fails to meet its obligation to cover the defaults of its customers or brokers. *See* Affidavit of Rosemary McFadden (Oct. 25, 1982), Ex. A (Exchange rule 41.06). The fund established by the rule has never been used and, given the solvency of most of the clearing members with "short" positions in the potato contract, its use in the event of trader defaults on the 1979 contracts was highly unlikely. In any event, the potential impact of the rule on the interests of Board members is too remote and speculative to allow any inference of bad faith amounting to fraud. If such a degree of self-interest were allowed to demonstrate bad faith, then exchange-board

members involved in futures markets would inevitably be subject to bad-faith charges, and the concept of exchange self-regulation would be undermined.

■ (b) *Financial interests of Board members and their customers.* The claims concerning both the clearing firms that would have been required to cover "short" customers' margins and the financial interest of Board members in short positions "held in the names of their friends, relatives, employees, nominees, partners, stockholders, business associates, agents or customers" lack any basis in fact or are insufficient as a matter of law. Before discussing and eventually voting in favor of emergency action, the Board considered "the question of possible conflict of interest among the members present," and each member "stated that he had no personal position in the March, April, or May 1979 contracts but some of the members of the Board indicated that their firms carried house and/or customer positions in the March, April, or May 1979 contracts." Affidavit of Rosemary McFadden (July 22, 1982), Ex. D (minutes of March 8, 1979 Board Meeting) at 2. The CFTC Report on the Exchange's emergency action makes detailed findings concerning Board-member positions in the May contract. A summary of these findings in the Report's discussion of Exchange bad faith conflicts with the minutes of the March 8 Board meeting only in that it states "one member had an individual short position of three contracts; the trading of this account was not under his control." CFTC Report at IV–15.6.[6] The Report concludes, how-

6. The CFTC Division of Trading and Markets' actual findings are presented in Appendix 16 of the Report. That appendix was redacted by the CFTC pursuant to § 8(a) of the CEA, 7 U.S.C. § 12(a) and CFTC regulation 145.5(c), 17 C.F.R. § 145.5(c), which provide for nondisclosure of market-position information obtained in a CFTC investigation. In response to a Court Order dated May 17, 1983, defendants obtained CFTC disclosure of Appendix 16 under a protective Order dated June 15, 1983. An unredacted copy of the appendix indicates that the CFTC found that one of the voting Board members held a short position of three contracts on March 8, 1979. This Board member has submitted an affidavit in response to disclosure of the CFTC finding, in which he avers that at present he believes and on the night of

March 8, 1979 he believed that he had no personal position in any of the 1979 potato contracts. This conflict between the CFTC findings and the Board-member affidavit creates an issue of fact concerning whether the Board member had a personal position on March 8, 1979, but that issue is not material in this litigation. The alleged position, which even the CFTC noted was not under the member's personal control, could have at most exposed the Board member to a $750 loss for each day it remained open in a rising market. Neither by itself, nor in combination with the meager, financial-conflict evidence detailed in the text, could a three-contract position of a single Board member be deemed significant evidence of the Board's bad faith.

ever, that no significant conflict of interest tainted the Board's actions. CFTC Report at IV–15, V–1.

Defendants have in addition to this general proof submitted on the pending motion fifteen affidavits concerning the 1979-potato-contract interests of each Board member. *See* Affidavits Attached to Defendants' Notice of Motion (July 23, 1982). These documents indicate that no Board member present at the March 8, 1979 meeting held a *personal* position in the March, April, or May 1979 contracts at the time of the meeting or at any subsequent time; that the majority of the firms with which these members were associated held no position in the March, April, or May contracts on March 8, 1979, or at any subsequent time; that four of these members' firms held positions in the March, April, or May contracts on March 8, 1979, but three of the four were long; that customers of seven of these members' firms held positions in the March, April, or May contract on March 8, 1979, but none of these customer positions was under the control of a Board member, and five of the seven firms held net-long customer positions; that only one of the four Board members not at the March 8 meeting held a personal position on or subsequent to March 8, 1979, but it was net long; that the firms or firm customers of only two of these four absent members held positions,

but these positions were both net long; and, finally, that all the fourteen (of fifteen) governors named by Spinale as defendants deny ever having any knowledge of any "close friends or relatives" holding positions in the March, April, or May contracts.[7] Thus, the only apparent evidence of financial self-interest among Board members present at the March 8, 1979 meeting consists of (1) the house positions for four members' firms and (2) the customer positions of seven members' firms. *See* Defendants' Memorandum (July 23, 1982), Ex. 1 (detailed summary of house and customer positions relating to each Board member).

Under CFTC regulation § 1.3(y), 17 C.F.R. § 1.3(y) house (or "proprietary") positions include the positions of employees, nominees, partners and agents of a commodities trading firm. *See* Defendants' Reply Memorandum 10 (Nov. 22, 1982). An initial deficiency concerning the house-positions evidence is that it relates to only a minority of four of eleven Board members present at the March 8 meeting. The declarations of emergency and all emergency actions passed almost without opposition,[8] and thus, even if firm positions do imply the possible bad faith of four Board members, those positions do not taint the entire Board's actions. Moreover, one of the four house positions consisted of only one contract, *see* Affidavit of George Gero ¶ 3 (July

---

7. The fifteenth Board member, Richard Jarecki, cast the only vote against any of the emergency actions, and he is the only Board member both present at the March 8 meeting and not named in Spinale's complaint. The extent of his knowledge of "close friends or relatives" holding positions in the March, April or May contract is not known because he is unavailable for swearing an affidavit. *See* Affidavit of Jean LeBreton ¶ 1 (July 13, 1982). Ten Board members have sworn affidavits which categorically state that no close friend or relative held any position in any of the potato contracts. Three Board members, two of whom were present at the March 8 meeting, have qualified their negative statements regarding the positions of close friends or relatives as "to the best of my knowledge." *See* Affidavit of Michael Marks ¶ 2 (July 8, 1982); Affidavit of Harvey Wachman ¶ 2 (July 12, 1982); Affidavit of Victor Buccellato ¶ 2 (July 21, 1982). One Board member acknowledges that his potato-trading uncle may have had a position in the May contract,

but the member avers that he has never known whether the uncle had a position or what that position may have been. Affidavit of Stanley Meierfeld ¶ 2 (July 9, 1982).

8. The declaration of an emergency concerning the April and May contracts passed unanimously. Affidavit of Rosemary McFadden (July 22, 1982), Ex. D (minutes of March 8, 1979 Board Meeting) at 3 n. 1. The declaration of an emergency concerning the March contract passed by a vote of 9–0, with two members abstaining, apparently because their firms' customers held positions in the March contract. *Id.* at 4 n. 3; *see* Defendants' Memorandum 15–16 (July 23, 1982). The emergency actions with regard to the April and May contract passed by a vote of 8–0, with three abstentions. McFadden Affidavit, Ex. D. at 3 n. 2. The emergency actions with regard to the March contract passed by a vote of 8–1, with one abstention and one member absent. *Id.* at 4 nn. 4 & 5.

13, 1982), and only one of the four house positions was short and therefore at odds with Spinale's interests. The Board member whose firm held the sole, short, house position has denied any control over this position, and the slim likelihood that his firm's short position of 24 contracts influenced this single Board member's votes is substantially negated by the existence of a net-long position of 91 contracts among the same firm's customers. *See* Affidavit of Charles Miller ¶ 3 (July 8, 1982).

The legal significance of the customer positions of seven Board members' firms is dubious. Apart from the difficulties that would be created for a scheme of self-regulation by a willingness to recognize a connection between a customer position and the self-interest of a Board member, such a connection is hardly obvious, since a customer's profits do not directly benefit a commodities trading firm or its employees. As the Second Circuit has specifically recognized, exchange-board members do not "necessarily take the same view as their customers." *Crowley,* 141 F.2d at 188. In any event, of the seven Board members whose firms had customer positions in the 1979 potato contract on March 8, 1979, three have denied that they had any knowledge of such positions on the night of March 8; and all six of these Board members who voted in favor of the emergency action have denied that they had any control over any of their firms' customer positions. *See* Affidavit of George Gero ¶ 3 (July 13, 1982); Affidavit of Charles Miller ¶ 3 (July 8, 1982); Affidavit of Ira Shein ¶ 3 (July 8, 1982); Affidavit of Michael Marks ¶ 5 (July 8, 1982); Affidavit of Stanley Meierfeld ¶ 3 (July 9, 1982); Affidavit of Jack Place ¶ 3 (July 23, 1982).

More important insofar as allegations by those with long positions are concerned, only two Board members were affiliated with firms with net-short, customer positions. One of these Board members abstained from voting on the emergency actions concerning the April and May contracts, the only contracts in which either his firm or his firms' customers held positions. *See* Place Affidavit; Affidavit of Rosemary McFadden (July 22, 1982), Ex. D (minutes

of March 8, 1979 Board Meeting) at 3 n. 2. The other Board member whose firm's customers were net short abstained in the vote for a declaration of a March-contract emergency and was absent for the vote on the March-contract emergency action. *See* Meierfeld Affidavits; McFadden Affidavit, Ex. D. at 4 nn. 3, 4 & 5. He did vote in favor of both the declaration and emergency action concerning the April and May contracts. *See* McFadden Affidavit, Ex. D at 3 nn. 1 & 2. Unlike his firm's customers' short position in the March contract (10 contracts), however, his firm's customers' net-short position in the April and May contracts (263 contracts) was partially offset by a long, house position in the May contract (100 contracts). *See* Meierfeld Affidavit.

In sum, Spinale can point to only three instances of possibly meaningful conflict between his financial interests and the financial interests of Board members. In one instance, the Board member involved has denied control over his firm's short, house position, which position was at least partially offset by the same firm's net-long customer position. In another instance, the Board member abstained in the 8–0 vote for emergency action regarding the April and May contracts in which his firm's customers were net short. In the final instance, the Board member either abstained or was absent from votes concerning the March contract in which his firm's ·customers were short, and although he participated in votes concerning the April and May contracts, his firm's net-short, customer positions for April and May were partially offset by its long, house position in the May contract.

 These instances of potential conflict, in the context of legislatively sanctioned self-regulation, do not raise an issue of fact concerning bad faith. In each individual instance of potential conflict, the likelihood of ulterior motive is substantially negated by lack of control, abstention, or offsetting interests. Moreover, even if each instance of potential conflict in fact represented an instance of bad faith, the three instances combined could not be deemed to

taint the entire Board's actions, especially in light of the offsetting instances of potential conflict with short interests in the Board as a whole. *See* Defendants' Memorandum (July 23, 1982), Ex. 1. The bad-faith standard can be satisfied only by substantial evidence supporting more than mere suspicion or speculation about a Board's ulterior motives for taking emergency action. Inasmuch as a system of self-regulation inevitably will provide dissatisfied traders with some evidence consistent with self-interest, the existence of bad faith must be tested by an objective standard, rather than a subjective standard that would permit trial on the issue of board members' state of mind virtually without regard for the insubstantiality of the objective, circumstantial evidence of ulterior motive. *Cf. Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 2737–39, 73 L.Ed.2d 396 (1982) ("good faith" immunity of government officials must be tested on summary judgment by objective standard in order to avoid extensive discovery and trial of insubstantial claims). On this motion for summary judgment, no need exists to define precisely when objective evidence of board self-interest is sufficient to create an issue of fact concerning bad faith. Nor is this litigation an appropriate vehicle for retrospectively creating new standards of behavior to avoid even the appearance of partiality by Board members.[9] Measured by any conceivable, objective standard, the financial interests of the Board members shown by their essentially uncontroverted affidavits do not raise an issue of fact concerning their bad faith in taking emergency

action in connection with the 1979 potato contracts.

(2) *Allegations Raised Outside the Complaint.* In a vigorous effort to avoid summary judgment, Spinale has raised outside his complaint a number of factually baseless, and legally insufficient arguments designed to create an issue of fact concerning Exchange bad faith.

■■■ (a) *Marks' trading nominee and personal positions.* Plaintiff challenged Exchange Chairman Marks' denial of knowledge of any relatives or close friends with potato contract positions on the basis of double hearsay and speculation concerning Marks' use of a trading nominee. *See* Affidavit of Anthony Spinale ¶¶ 5–7 (Jan. 10, 1983). Spinale's counsel went so far as to make the imaginative suggestion that the alleged nominee's Shakespearean, trading-floor moniker "Iago" supported the speculation that the alleged nominee represented the interests of another. Affidavit of Richard A. Miller, Esq. ¶¶ 10–11 (Jan. 7, 1983). Affidavits submitted by defendants conclusively demonstrate that Spinale's claims regarding Marks' nominee account are without any basis in fact. *See* Affidavit of Michael Marks (Feb. 22, 1983); Affidavit of Harry Schulman (Feb. 23, 1983). Plaintiff's counsel also attempted to undermine the credibility of Chairman Marks' affidavit by pointing out the length of Marks' lawfully redacted answer to a CFTC deposition question concerning his personal positions. *See* § 8(a) of the CEA, 7 U.S.C. § 12(a) (providing for nondisclosure of market-position information obtained in CFTC investiga-

---

**9.** Perhaps commodities exchanges should consider proposing regulatory guidelines to the CFTC that would enable boards readily to determine which, if any, of their members should recuse themselves from participating in particular self-regulatory actions. *See* P. Johnson, Remarks at *Legal Times* Seminar on Commodities Futures Litigation and Regulation at 6–7 (Sept. 20, 1982) ("What is needed ... are systems and procedures built into the decision-making process that provide a reasonable assurance that exchange actions are taken impartially and are perceived as such. The trading public deserves no less than that, and exchange members are entitled to this measure of protection against baseless assaults on their personal integrity."); *see also Hearings on S. 2109 Be-*

*fore the Subcommittee on Agricultural Research and General Legislation of the Senate Comm. on Agriculture, Nutrition, and Forestry,* 97th Cong., 2d Sess. 10 (1982) (statement of Sen. Jepsen) ("[E]stablishing conflict of interest standards for members of exchange boards ... is a key to the integrity of the industry."). Such an organized framework would create both more public assurance and protection from baseless assaults than the ad hoc procedure whereby the Board on March 8, 1979 decided that each member should "determine for himself whether he could vote objectively and impartially on any of the resolutions which might be presented at the meeting." McFadden Affidavit (July 22, 1982), Ex. D (minutes of March 8 Board meeting) at 2.

tions); CFTC regulation 145.5(c), 17 C.F.R. § 145.5(c) (same). According to plaintiff's counsel, the length of Marks' response suggested a conflict between the redacted testimony and Marks' denial by affidavit of any personal position in the potato contract on March 8, 1979. *See* Miller Affidavit ¶¶ 8–9. In response, defendants supplied the redacted answer, demonstrating that no such conflict exists. *See* Marks Affidavit.

(b) *March 8 trading of floor-broker Board members.* In addition to highlighting the potential self-interest of the two nonabstaining Board members whose firms held either short, customer or short, house positions, *see* Miller Affidavit ¶ 15, plaintiff asserts that three Board members who were floor brokers "took advantage of the market" by trading in potato contracts on March 8, 1979. Miller Affidavit ¶¶ 12–13, 18(g); *see* Affidavit of Dr. Ronald W. Cornew ¶¶ 7–8 (Jan. 7, 1983).

The relevance of trading in potato contracts by floor-broker members of the Board is unclear. The significant facts concerning potential Board self-interest are the positions of members at the time the votes were taken, not the various positions taken by members during the final day of trading. Even if a Board member knew emergency action would be taken, he would have little opportunity to exploit that knowledge without maintaining an overnight position. Any member's decision to take and close a long position and thus profit on the rising market would be virtually unaffected by the knowledge that liquidation of the contract would be ordered at the day's closing price. The only possible advantage in knowing in advance of such an emergency liquidation would be in the event a Board member chose to close his long position at a price he somehow knew was higher than the day's closing price, which he hypothetically knew would be imposed as a liquidation price by exchange action.

No apparent method exists whereby knowledge of Exchange emergency actions could be exploited by taking and closing short positions in a rising market. *See* Defendants' Second Reply Memorandum 10 (March 15, 1983). At oral argument, however, plaintiff's counsel raised an alternative theory of an Exchange short-selling manipulation which had been noted in plaintiff's initial brief. *See* Transcript 38–50; Plaintiff's Memorandum 42 (Nov. 15, 1983). According to plaintiff, Board members may have used their supposed knowledge of an emergency closing of the potato-contract market to organize a short-selling spree designed to lower the March 8 closing price and thus limit the losses of persons with preexisting short positions. (Such a conspiracy would, of course, not be aided by short positions that were taken and then closed on March 8, because downward pressure on prices created when such positions were taken would be offset by the purchase of long contracts when the positions were closed.) Insofar as this theory is negated by the predominantly long nature of the potato-contract positions in which Board members arguably had interests on March 8, plaintiff demonstrated his flexibility by responding that Board members may have advised others to sell short, rather than take such short positions for themselves or their firms. Despite the inherent implausibility of the suggestion that shorts would bury themselves deeper in short contracts for the sake of potentially keeping the price increase for March 8 somewhere below the daily price-movement limit of fifty cents, the Court invited plaintiff to produce any evidence that any person was advised by a Board member to sell short. *See* Transcript at 49–50. No such evidence has been produced, and the internally inconsistent and untenable suggestions of plaintiff's expert are no substitute for evidence of this claim.[10]

10. Plaintiff's expert claims that potato-contract price movements between March 5 and March 8 (in particular the failure of price increases on March 6, 7 and 8 to reach the fifty-cent limit) "are inconsistent with and not supportive of the declaration of an emergency, but may instead reflect artificial influences upon the market." Affidavit of Dr. Ronald W. Cornew ¶¶ 4(c), 11–22 (Jan. 7, 1983). One would think that either the price movements demonstrate that the delivery failures were not viewed as a serious emergency by the market (in which case the Board's actions, at least in hindsight, may have been unnecessary), or the movements suggest that information apart from that

Apart from the dearth of evidence of abuse of foreknowledge of emergency action, plaintiff has produced no substantial evidentiary support that Board members actually had any foreknowledge. To infer foreknowledge of the emergency action taken at the March 8 meeting from the potato-contract trading of floor-broker Board members tends to undermine the foundations of commodities exchange self-regulation by permitting dissatisfied traders to bootstrap virtually any involvement of Board members in the markets they regulate into evidence of bad faith. (Similarly, plaintiff's reliance on statements at the March 8 Board meeting concerning the difficulty some Board members' customers were having in delivering on or maintaining short positions is plainly misplaced. Rather than suggesting bad faith on the part of any member, much less the entire Board, these statements merely illustrate the extent to which self-regulation appropriately relies on the first-hand knowledge of individuals involved in the markets.)

Plaintiff nonetheless attempts to demonstrate an issue of fact concerning alleged Board-member foreknowledge of emergency action by citing the following portion of the transcript of a March 8 CFTC meeting, in which Acting Chairman Seevers reported on a telephone conversation he had just concluded with Exchange Chairman Marks:

> ACTING CHAIRMAN SEEVERS: Their board has scheduled a meeting tomorrow at 5:00 or 5:30 and they are planning to take an emergency action, prepared to take an action. He [Marks] does not know—
>
> MR. DUNN: Planning or prepared to?

> ACTING CHAIRMAN SEEVERS: What he said was they are planning to take an emergency action with respect to the April and May contracts within two or three days, and I said, "Are you prepared to take that action tomorrow," and he said, "Yes, we are."

Affidavit of Richard A. Miller, Esq. (Nov. 15, 1982), Ex. 1 (transcript of March 8 CFTC meeting) at 1. If anything, however, Seevers' report on his conversation with Marks demonstrates that the March 8 decisions were an unanticipated result of Marks' last-minute decision to call a Board meeting on the night of the 8th. *See* Transcript of Nov. 24, 1982 Oral Argument at 39. Moreover, Marks' assurances of the Board's intent to take some unspecified emergency action were apparently offered in response to Seevers' leading inquiries about the Exchange's willingness to take emergency action on March 9. Seevers was undoubtedly encouraging the Board to act, and when he learned that Marks had decided to call a meeting on March 8 he urged prompt action, in accordance with the CFTC's previously agreed-upon policy. *See* McFadden Affidavit (July 22, 1982), Ex. E (May 9, 1979 NYME Statement) at 9; Miller Affidavit, Ex. 2 (transcript of March 9, CFTC meeting) at 7; *see also* CFTC Report at II–20 to II–21. Thus, the statements referred to by Spinale explain why Marks and the Board acted on March 8, rather than waiting as they had apparently intended; the statements do not remotely suggest the existence of a Board conspiracy to manipulate the potato-contract market on the basis of foreknowledge of specific emergency action on the night of March 8, or at any other time.

---

concerning the serious delivery crisis kept prices below limit; the price movements could not reflect both a nonemergency situation and a manipulation designed to depress prices despite the existence of an emergency. Moreover, plaintiff's expert, insofar as his reference to "artificial influences" is intended to imply an illegal manipulation based on definite foreknowledge of Exchange emergency action, ignores the possibility that the below-limit price movements resulted from rumors or expectations of some form of Exchange or CFTC emergency action. Given the size of the divergence between cash and futures prices, and the apparently well-known CFTC dissatisfaction with prior Exchange nonresponses to crisis situations, such rumors or expectations may well have developed. (In November 1976 a shortage of railroad cars caused a serious delivery crisis in the November potato contract. The Board, despite CFTC pressure, failed to take emergency action, and the CFTC invoked for the first time its own market-emergency powers. *See* [1975–77 Transfer Binder] Comm.Fut. L.Rep. (CCH) ¶¶ 20,234–37).)

(c) *Personal animosity.* Another theory of bad faith raised by Spinale outside his complaint concerns the alleged personal animosity towards plaintiff of certain Board members. Spinale was undoubtedly on the minds of some Board members on the night of March 8, 1979. As detailed by plaintiff, references to Spinale in the transcript of the CFTC meeting held in the early evening of March 8, 1979 indicate that at least some Board members as well as Exchange President Levine (who was not a voting Board member) considered Spinale "a bad actor" whose refusal to negotiate in a crisis situation amounted to "ripping off the shorts." *Spinale* Plaintiff's Memorandum 12 (Nov. 15, 1982); *see* Affidavit of Richard A. Miller, Esq. (Nov. 15, 1982), Ex. 1 (transcript of March 8, 1979 CFTC meeting). Indeed, Acting CFTC Chairman Seevers concluded, apparently on the basis of what he had heard from President Levine and Exchange Chairman Marks (with whom Seevers had spoken by phone just prior to the CFTC meeting), that the Exchange "ought to investigate and possibly take strong disciplinary action against [Spinale]." *Id.*

Apart from these statements at the March 8 CFTC meeting, plaintiff has pointed out alleged references to Spinale at the CFTC Public Hearing held on May 9, 1979 in Presque Isle, Maine. At that hearing one individual involved in the Maine potato industry recalled that a few days before the March 8 emergency action Exchange President Levine had pointedly inquired whether the individual's firm had sold potatoes to Spinale's firm; another individual from the Maine potato industry testified that at about the same time Levine had approached him on the floor of the Exchange and asked "What are they trying to do to me? . . . Was this a planned plot?," an apparent reference to then-current rumors of an organized-crime conspiracy to bribe USDA inspectors, in which Spinale claims Board members suspected Spinale's involvement. *See* Affidavit of Anthony Spinale ¶¶ 11–12, 15 (Jan. 10, 1983); Affidavit of Richard A. Miller, Esq. (Jan. 7, 1983), Ex. A (transcript of May 9, 1979 CFTC Public Hearing) at 98–102, 205–06. In addition, Spinale offers his own recollection of a conversation he had with Board member Sam Fishberg on the Exchange floor sometime between March 5 and March 8, 1979. According to Spinale, Fishberg suggested that Spinale liquidate his potato contracts inasmuch as Spinale's intention to stay with his long position and accept delivery threatened the Exchange's hard-won success in building a high trading volume. Spinale Affidavit ¶ 13 (Jan. 10, 1983). Finally, plaintiff has submitted the affidavit of an Exchange floor broker who recalls that hostile remarks concerning Spinale's intransigence were made to the floor broker by Board members during the weeks leading up to the emergency action. Affidavit of Leon Grappel ¶ 5 (Dec. 27, 1982).

█ Plaintiff's theory of bad faith based on personal animosity is, in the circumstances of this case, deficient as a matter of law. In *P.J. Taggares Co. v. New York Mercantile Exchange,* 476 F.Supp. 72 (S.D.N.Y.1979), Judge Weinfeld concluded that an allegation of "discriminatory" exchange conduct is insufficient where exchange bad faith must be alleged. 476 F.Supp. at 77 n. 22. *Taggares* involved an Exchange order increasing margin requirements on the May 1977 potato contract only for traders who had failed to deliver against the May 1976 contract, a group which the plaintiffs claimed to include only themselves. 476 F.Supp. at 73. The alleged motive for this "discrimination" was the Exchange's view that the plaintiffs were attempting to manipulate the market by planting false news reports. 476 F.Supp. at 74.

*Taggares* does not hold that allegations concerning exchange discrimination or personal animosity could never satisfy the bad-faith standard, and no doubt discriminatory treatment or personal animosity motivated by concerns wholly unrelated to an exchange board's self-regulatory duties could conceivably support a finding of exchange bad faith. But, as with the alleged discrimination in *Taggares,* the personal animosity claimed in *Spinale* was plainly motivated solely by concerns closely related to the Exchange's "statutory mandate to protect

the integrity of the market." 476 F.Supp. at 78–79. Nowhere does Spinale allege that the claimed animosity of any Board member or Exchange official was caused by anything other than Spinale's refusal to cooperate in efforts to resolve the March delivery crisis and suspicions that Spinale was somehow involved in rumored conspiracies behind the inspection failures. Indeed, the evidence offered by Spinale, as well as his own statement of his personal-animosity theory of bad faith, *see* Spinale Affidavit ¶¶ 9, 15–16, demonstrate that any Exchange animosity toward Spinale that may have influenced the emergency action was not improperly motivated by concerns foreign to the Board's self-regulatory duties. The Exchange Board may well have been justified in focusing concern on Spinale, since the Board arguably should prevent members from acts of excessive greed in a time of artificially created crisis. But regardless of how incorrect or unreasonable the Board's feelings about Spinale may have been, the personal animosity alleged by Spinale does not create an issue of fact concerning Exchange bad faith. *See* Transcript of Nov. 24, 1983 Oral Argument at 54–55.

 (d) *The emergency action itself.* Finally, Spinale asserts that the emergency action itself creates an inference of bad faith. According to plaintiff, the Exchange's emergency action was so negligent and irresponsible as to support independently a finding of bad faith. Plaintiff's Memorandum 5, 15 (Nov. 15, 1982). No doubt, issues of fact exist concerning the reasonableness of the emergency action. If the bad-faith standard is to have any meaning, however, issues of fact concerning a commodities exchange's possible negligence cannot too readily be converted into issues of fact concerning bad faith. To serve its purpose of protecting exchanges in the exercise of their self-regulatory responsibilities, *see Crowley,* 141 F.2d at 188, the bad-faith standard can be met only by evidence distinctly stronger than evidence showing mere negligence, *see Miller,* 550 F.2d at 766 (holding that, although evidence may have created jury question concerning exchange negligence, no evidence supported a finding

of bad faith). Thus, more than unreasonableness must be demonstrated to raise independently an issue of fact concerning bad faith. Only a demonstration of reckless and virtually irrational exchange behavior could conceivably be permitted to raise independently an issue of fact concerning bad faith. As Spinale's counsel put it at oral argument, if the Board "had decided to make golf balls deliverable under" the potato contracts, then an inference of bad faith should be permitted from the emergency actions alone. *See* Transcript at 52.

 Plaintiff has failed to raise an issue of fact concerning the kind of reckless and irrational exchange behavior that might theoretically support an inference of bad faith. Plaintiff's reliance on transcripts of March 1979 CFTC meetings is entirely misplaced. Even as selectively presented in Plaintiff's Memorandum 7–11, 13–15 (Nov. 15, 1982), these transcripts demonstrate little more than that the Exchange may have acted in undue haste and without sufficiently considering a number of alternatives to the somewhat drastic actions taken, such as experimenting with more careful culling and packing of potato shipments, allowing delivery of commercial-grade potatoes under the March contract (such potatoes were already permitted under the April and May contracts at a 25% discount), or temporarily limiting April and May contract trading to liquidation only, rather than fully suspending all trading in those contracts.

Plaintiff emphasizes that, at a meeting on the morning of March 9, one commissioner suggested as "devil's advocate" that the Exchange may have "acted ... out of hysteria" caused by CFTC pressure for prompt action. Miller Affidavit, Ex. 2 (transcript of March 9 CFTC meeting) at 10–11; *see* Plaintiff's Memorandum 13. This suggestion does not imply the kind of reckless and irrational actions that might support an inference of bad faith. Moreover, in response to the objections of two other commissioners, including Acting Chairman Seevers' assertion that "[t]hey handled this very professionally", the commissioner backed-off his avowedly provocative suggestion of Ex-

change hysteria. Miller Affidavit, Ex. 2 (transcript of March 9 CFTC meeting) at 11. As conclusively demonstrated by Defendants' Reply Memorandum 17–22 (Nov. 23, 1982), the CFTC Commissioners and CFTC's expert staff, while not unanimously approving of the Exchange's decisions, never doubted the existence of a serious problem in the potato-contract market, and they did not react to the Exchange's action with anything like the kind of shock and dismay that might suggest the Exchange had acted in a reckless or irrational fashion. Of particular note are the unanimous agreement of all commissioners present at the March 8 meeting that emergency action of some kind was needed, Miller Affidavit, Ex. 1 (transcript of March 8 CFTC meeting) at 69, 73–75, 79, 81, and the majority of commissioners' substantial agreement with the laudatory statement issued by Acting Chairman Seevers following the CFTC's March 9 meeting, *see* Miller Affidavit, Ex. 2 (transcript of March 9 CFTC meeting); CFTC Report, App. 20 (March 9, 1979 CFTC press release in which Acting Chairman Seevers described Exchange emergency measures as "prompt action ... in the best tradition of self-regulation of the futures markets").

The after-the-fact analysis of plaintiff's expert also fails to raise an issue of fact concerning the existence of the kind of reckless and virtually irrational exchange action that might independently support an inference of bad faith. Defendants' expert demonstrates the misleading nature of plaintiff's expert's analysis of alleged "inconsistencies" in the Exchange's statistical records and the significance of potato-contract price movements during a previous period of delivery failures. *See* Affidavit of Maureen Lynch (March 16, 1983). Furthermore, plaintiff's expert's failure to apprise the Court of the distinction between "last" price and "closing" price (the former being literally the last price and the latter representing a weighted average of all prices reached in the last two minutes of a trading day) suggests either an absence of expertise or a considered and indefensible attempt to avoid summary judgment by raising frivolous nonissues of fact. *Com-pare* Lynch Affidavit ¶ 2 *with* Cornew Affidavit ¶ 9 & n. 3. But even if the analysis were trustworthy, plaintiff's expert does not claim that the Exchange's actions were reckless or irrational. Rather, his affidavit describes the emergency measures as "totally out-of-proportion to the market's price behavior" and asserts that in his opinion "neither the price movements of March 1979, or the cash-to-futures divergence, or both, would justify complete liquidation." Cornew Affidavit ¶¶ 12, 16. The affidavit concludes only that "it appears that the market data analyzed to date supports plaintiff's allegation there was no valid reason for the Board's 'emergency' actions." Cornew Affidavit ¶ 22.

In contrast to plaintiff's expert's tentative conclusions based solely on an after-the-fact analysis of market data, the detailed, fifty-page report of the CFTC's Division of Trading and Markets concluded that the Exchange "did not act in a manner that was arbitrary, capricious or an abuse of discretion and did not exercise bad faith" with respect to any emergency action taken on the night of March 8, 1979. CFTC Report at V–1. The report was based on the Exchange's required, written justification for emergency action, *see* CFTC regulation 1.41(f), 17 C.F.R. § 1.41(f); depositions of key members of the Exchange Board and staff; public hearings held in Presque Island, Maine on May 9 and 10, 1979; and informal discussions among Trading and Markets Division personnel, USDA staff-members, persons in the CFTC's Division of Econometrics and Education, and an individual Commissioner's assistant. CFTC Report at I–1. It extensively and rationally analyzes the events leading to the declaration of emergencies, including potato-contract deliveries in November 1978, and the Exchange's market surveillance in December 1978, and January and February 1979. CFTC Report at II–1 to II–7. In an exhaustive discussion of the events of March 5–8, 1979, the report reviews the Exchange's contacts with the USDA, the CFTC, and various market participants, and discusses the various emergency remedies considered by the Exchange staff. CFTC

Report at II–7 to II–24. The report also carefully describes the questions involved and the actions taken at the March 8 Board meeting. CFTC Report at II–24 to II–34. In addition, the Exchange's compliance with CFTC regulations and Exchange rules is closely examined. CFTC Report at IV–1 to IV–15. Although every aspect of the report's findings may not be entitled to conclusive weight, the Report establishes that the Exchange's actions were not so reckless and irrational as to permit in themselves an inference of bad faith.

Spinale's complaint and the evidence he submits fail, therefore, to present a case of bad faith or knowing inaction with sufficient strength to withstand defendants' motion. Whether viewed issue-by-issue, or in its totality, the evidence presented and allegations made do not warrant a trial under the applicable standards of law.

## IV. *Failure to Amend the Terms of the Potato Contract*

The claims in *Wong* concerning the Exchange's failure to amend the terms (or "rules") of the potato contract raise questions under the CEA that require separate treatment. According to Wong's complaint, the Exchange since 1973 "knew, or should have known" that its potato contract was "a defective contract." Complaint ¶ 22. The contract's alleged defects include its provisions for delivery of Maine-grown, U.S.-No.-1-grade potatoes and its requirement of inspections both at point of origin and point of destination. *Id.* Because of these defects, the contract "was not suitable for providing the economic benefits of price discovery and hedging," and it therefore breached the Exchange's "special duty to . . . producers, owners, processors and merchandizers of potatoes to ensure that the contract which [the Exchange] offered for trading was fit for the purpose of hedging." Complaint ¶¶ 27, 28. The CFTC supports this view to the extent that it contends that the CEA does imply a private cause of action against an exchange for failure to revise a contract which the exchange has been alerted needs revision, so long as the information indicating a need to revise the contract was developed after the contract was last approved by the CFTC.

The CEA does contemplate, as plaintiff and the CFTC contend, that exchanges should regard themselves as obliged to write and revise contracts that serve the law's objectives, and that do not unjustifiably permit unlawful manipulation and other illegal conduct. But the contract revision responsibilities conferred upon exchanges by the CEA, and the statutory scheme in which they occur, confer no rights upon individuals who trade on such exchanges, fully aware of the alleged shortcomings of the contracts they choose to buy and sell, to seek damages in private litigation. The CEA contemplates that contract revision should occur through initiatives of exchanges, the CFTC, and traders, taken in the administrative process, and enforced through limited judicial review only to the extent that the administrative process leads to the adoption of contract terms legally unsupportable under the Act. Assuming, however, that a private, damages remedy should nevertheless be implied for the breach of some form of contract-revision duty, the standard to be imposed in judging whether the claimed duty was breached would be at least as stringent as the bad-faith standard employed in judging the legality of an exchange's emergency actions, and Wong's allegations concededly do not satisfy that standard. Moreover, application of the CFTC's proposed requirement of information developed after the agency's last contract approval would independently subject the *Wong* complaint to dismissal.

A. *Defendants have no duty to revise contracts that are enforceable in private actions for damages.*

■ In asserting that the failure of the Exchange to revise the potato contract violated the CEA, Wong relies on §§ 5(a), 5(g) and 5a(10) of the Act, 7 U.S.C. §§ 7(a), 7(g), 7a(10). *Wong* Plaintiff's Memorandum In Opposition 36. Section 5(a) provides that the CFTC may designate an exchange as an official "contract market" in a particular commodity only when the exchange is "located at a terminal market" where the commodity involved in the proposed contract is "sold in sufficient volumes and under such conditions as fairly to reflect the general

value of the commodity and the differences in the value between various grades of such commodity," except that an exchange not located at a terminal market where meaningful pricing takes place may still be designated if the exchange provides for delivery of the commodity "at a delivery point or points and upon terms and conditions approved by the Commission." The purpose of this subsection is to assure the location of contract delivery points at viable cash markets. *See* 1 P. Johnson, *Commodities Regulation* § 2.09 (1982). The section lends no support to Wong's theory, because its exchange-location requirement (assuming that requirement is somehow relevant to Wong's failure-to-amend claim) can be eliminated when delivery points and other contract terms and conditions have received CFTC approval, as had the potato-contract rules at issue here. *See* Supplemental Affidavit of Rosemary McFadden (Aug. 31, 1982). Moreover, § 5(a) deals with a condition for CFTC designation of an exchange, not with a privately enforceable duty of an exchange vis-a-vis users of its contracts.

Section 5(g) also fails directly to support the notion that an exchange's failure to amend contract rules may violate the CEA. The section provides that for CFTC designation an exchange must demonstrate "that transactions for future delivery in the commodity for which designation as a contract market is sought will not be contrary to the public interest." Section 5(g)'s "public interest" requirement embodies an economic-purpose test whereby an exchange must demonstrate that its proposed contracts will be used for base-pricing and hedging, not just for speculation. Conf.Rep. No. 1383, 93d Cong., 2d Sess., *reprinted in* 1974 U.S. Code Cong. & Ad.News 5843, 5897–98; *see* 1 P. Johnson, *Commodities Regulation* §§ 2.06–2.07 (1982) (discussing § 5(g)'s legislative history and suggesting that subsection's "public interest" standard might even permit some commercially useless futures contracts). But like § 5(a), § 5(g) is a condition for "contract market" designation, not as such an exchange duty toward users of futures contracts. Thus, even if the provision requires an exchange to scrutinize the hedging characteristics of its contracts

as a prerequisite of designation, § 5(g) does not necessarily create an ongoing exchange duty to users to amend CFTC-approved contracts which may provide a poor hedge against cash-market price fluctuations. In this connection, plaintiff's reliance on CFTC regulation 1.51, 17 C.F.R. § 1.51 and CFTC Guidelines No. 1 and No. 2 are misplaced. *See* Plaintiff's Memorandum In Opposition 19–20, 36–37. Regulation 1.51 and the two guidelines do not even attempt to create such a duty. Regulation 1.51(a)(2) requires exchanges to surveil for "market situations conducive to possible price distortions"; in addition, CFTC regulation 1.50(b), 17 C.F.R. § 1.50(b), provides that a contract market's failure to continue to comply with any designation requirement is "cause for action *by the Commission.*" (Emphasis added.) While both these regulations impose ongoing duties on exchanges in connection with the § 5(g) designation requirement, they do not create a specific duty to propose contract amendments enforceable by ex-post-facto, private suits. *But cf.* CFTC Brief 14 (duty to propose amendments is "implicit" in regulations 1.50 and 1.51). Guideline No. 1 merely details the showing required by the CFTC for contract-market designation under § 5 of the CEA, *see* 1 P. Johnson, *Commodities Regulation* § 2.10 at 223–25, and Guideline No. 2 elaborates the market-surveillance requirements of regulation 1.51, *see* 1 P. Johnson, *supra* § 2.17 at 237–38.

Section 5a(10) requires exchanges to "permit" delivery "of such grade or grades at such point or points and at such quality and locational price differentials as will tend to prevent or diminish price manipulation, market congestion, or the abnormal movement of such commodity in interstate commerce." Rather than creating conditions for designation as a contract market by the CFTC, § 5a(10) thus imposes a specific, ongoing duty on exchanges. Like § 5(a) and § 5(g), however, the provision does not suggest a privately enforceable duty to revise and update contract rules to assure the contract's hedging characteristics.

Section 5a(10)'s reference to prevention of "price manipulation, market congestion, or the abnormal movement of such commodity in interstate commerce" presumably encompasses assurance of proper hedging characteristics within the section's goals. The conditions listed are ill-defined, and they do not specifically include poor convergence of cash and futures prices near date of delivery, but market congestion is an event that may result from such poor price convergence. *See generally* 1 P. Johnson, *Commodities Regulation* § 1.27. Nonetheless, the structure of § 5a(10) indicates that the section does not impose an affirmative duty on exchanges independently to revise their contracts. The provision does not require exchanges themselves to propose certain contract terms; rather, § 5a(10) merely directs exchanges to "permit" contract terms that prevent manipulation, congestion, or abnormal movement of a commodity. The use of "permit" rather than "propose" or a similarly active verb suggests a deliberate effort to avoid placing an affirmative duty on exchanges concerning the terms of their futures contracts.

The full text of § 5a(10) further suggests the section places no affirmative duty on exchanges. Following the opening sentence concerning the terms which exchanges are required to permit, § 5a(10) directs the CFTC "after investigation" to "notify the contract market of its finding [that contract rules do not comply with the provision's goals] and afford the contract market an opportunity to make appropriate changes in such rules and regulations." If an exchange fails to make changes suggested by the CFTC, then § 5a(10) empowers the CFTC itself to alter or supplement the exchange's contract rules, provided that, in the case of orders involving additional delivery points, the exchange "has had notice and opportunity to file exceptions to the proposed order." This section's purpose, therefore, is to give the CFTC power to force changes onto recalcitrant exchanges, and thus encourage them to act when agency recommendations are made, without the formal exercise of the CFTC's power. *See* 1* P. Johnson, *Commodities Regulation* §§ 1.27, 2.10 (1982). According to the lead-

ing commentator, "the Commission [as of late 1981] has not formally exercised its authority under section 5a(10) but, like the gunboat in the harbor, its existence has proven effective in encouraging the markets to rethink certain of their contracts." Johnson, *supra* § 2.10 at 221. Contrary to plaintiff's argument, § 5a(10) does not suggest, let alone provide for, a privately enforceable exchange duty to amend the terms of futures contracts; to the contrary, by suggesting only a responsibility to "permit" appropriate provisions and to respond to CFTC findings, and by authorizing the CFTC to compel the adoption of any change it finds is proper, the section strongly suggests a structure for reviewing contracts antithetical to a privately enforceable duty, outside the administrative process.

The CFTC maintains that an exchange's failure to propose contract amendments violates the CEA where the exchange has "reason to believe that the existing terms and conditions cannot adequately serve to maintain an orderly market or prevent manipulation." CFTC Brief 15. Thus, rather than focusing on provisions that might conceivably create a specific, privately enforceable exchange duty to amend contract rules to assure hedging quality, the CFTC argues that a duty to propose amendments is encompassed by an exchange's "duty to maintain an orderly market and prevent manipulation." CFTC Brief 12. The CFTC relies in particular on § 5(d) of the CEA, 7 U.S.C. § 7(d), which requires as a condition of contract-market designation that exchanges "provide for the prevention of manipulation of prices and the cornering of any commodity . . . ." According to the CFTC, the Supreme Court in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982) confirmed the holdings of earlier cases that § 5(d) creates exchange duties that may be enforced in a private action. *See, e.g., Deaktor v. L.D. Schreiber & Co., supra,* 479 F.2d 529; *Seligson v. New York Produce Exchange, supra,* 378 F.Supp. 1076. Although *Curran* as well as *Deaktor* and *Seligson* involved allegations of exchange failures to respond to unlawful trading activi-

ty, not failures to amend contract rules, the CFTC asserts that the § 5(d) duty to maintain an orderly market by preventing manipulation and cornering may be breached as much by a failure to amend rules as by a failure to control unlawful activity.

This argument is flawed. Prevention of the two activities actually mentioned by § 5(d)—manipulation and cornering—does not necessarily suggest a broad requirement of maintaining an orderly market by preventing disruptions caused by contracts with poor hedging characteristics. *See generally* 1 P. Johnson, *supra* § 2.17. More important, § 5(d), like the rest of § 5 and unlike all of § 5a, states a condition for exchange designation, not an exchange duty. Thus, in *Curran* the complaint did not allege a cause of action for violation of § 5(d) alone, but rather of § 5(d) in conjunction with § 5a(8), 7 U.S.C. § 7a(8). *See* 456 U.S. at 372 n. 49. Section 5a(8) specifically imposes a duty on exchanges to enforce all their bylaws, rules, regulations and resolutions which have been duly approved by the CFTC under § 5a(12), 7 U.S.C. § 7a(12). Where an exchange has failed to control improper trading activities, a violation of the CEA may exist because § 5a(8) requires an exchange to enforce the rules and regulations against such activities which § 5(d) requires the exchange to promulgate as a condition of designation. Where an exchange has failed to propose amendments to a defective contract, however, a violation of the CEA does not exist because, even if § 5(d) implicitly conditions designation on providing for the amendment of defective contracts, no subsection of § 5a imposes an affirmative duty on an exchange to propose amendments to its defective contracts. Plainly § 5a(8) imposes no such duty; to the contrary, that provision requires exchanges to enforce, not amend, all duly approved rules, including contract rules. Section 5a(10), 7 U.S.C. § 7a(10), does deal explicitly with exchange duties in connection with the terms of futures contracts, but, as discussed, the language of that provision and its emphasis on the CFTC's role in proposing amendments to exchanges, indicate that it was not meant to create a privately enforceable,

exchange duty to propose amendments to CFTC-approved futures contracts.

The CFTC also points out that under § 6(a) of the CEA, 7 U.S.C. § 8, an application for contract-market designation must show exchange compliance with the § 5 requirements and provide "a sufficient assurance that [the exchange] will continue to comply with" those requirements. CFTC Brief 14. Such "sufficient assurance" of future compliance is merely another designation prerequisite which does not in itself impose an ongoing duty. Indeed, by demanding assurance in lieu of simply transforming § 5's requirements into duties, § 6(a) highlights the contrast between the requirements for designation of § 5 and the ongoing duties of § 5a.

In the absence of any express provision for an exchange duty to propose contract amendments, the existence of such a duty must depend on judicial construction, based on the CEA's purposes, provisions, and traditionally accepted scope. Indeed, the CFTC seems to acknowledge as much by asserting that an exchange duty to propose contract amendments is "implicit" in the various requirements and duties detailed in § 5 and § 5a of the Act, 7 U.S.C. §§ 7, 7a, and in the "assurance" of compliance with the § 5 requirements provided for by § 6(a), 7 U.S.C. § 8. According to the CFTC, "these provisions would be rendered meaningless" if an exchange were not required to propose amendments which it knows or should know are needed to maintain an orderly market. CFTC Brief 14–15. No doubt the legislative history or the evident purposes and policies of the CEA, or any other statute, may sometimes require judicial interpretation somewhat at variance with a strictly literal reading of statutory language. *See Leist v. Simplot,* 638 F.2d 283, 322–23 (2d Cir.1980) (Friendly, J.) (legislative history of § 4b of the CEA, 7 U.S.C. § 6b, suggests broader scope for section than that suggested by "crabbed language" of statute itself), *aff'd on other grounds sub nom. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982). The legislative history of the CEA is silent,

however, on the topic of a privately enforceable exchange duty to amend defective futures contracts, and the evident purposes and policies of the Act do not weigh in favor of such a duty, certainly not so plainly as to justify finding it "implicit" in the CEA provisions dealing with the designation requirements and duties of exchanges.

An exchange duty to propose contract amendments could tend to promote the policies behind the CEA. Close attention by exchanges to their contracts' viability as hedging devices would promote orderly markets, and imposing on exchanges a duty to propose needed contract amendments, enforceable by private suits for damages, would encourage such close attention. Moreover, Congress has historically relied upon exchange self-regulation of futures markets, and so, despite the CFTC's extensive authority both to approve and to force contract terms, *see* §§ 5a(10), 5a(12) & 8a(7) of the CEA, 7 U.S.C. §§ 7a(10), 7a(12), 12a(7), an exchange duty to propose needed amendments would be consonant with the CEA's general scheme of federal regulation as a supplement to self-regulation, *see Curran,* 456 U.S. at 382, 102 S.Ct. at 1841; 1 P. Johnson, *supra* § 2.16.

Nonetheless, the evident benefits of imposing on exchanges a duty to propose contract-rule amendments are balanced by other concerns which rebut the suggestion that, despite the absence of an express provision in the CEA, Congress intended a duty to propose amendments, enforceable by private damages actions. Perhaps the foremost objection to allowing private suits for damages against an exchange for failure to propose amendments is the ex post facto nature of such claims. Having elected to trade in one of an exchange's futures contracts, an individual is presumed to have known of and accepted the rules of the exchange, especially the rules governing the terms of a chosen contract. *See Crowley,* 141 F.2d at 188; *P.J. Taggares Co.,* 476 F.Supp. at 77. Thus, although the terms of a futures contract (other than price) are non-negotiable, a person who enters such a contract has been assumed to have accepted the risks that the contract will prove a poor vehicle for speculation or hedging.

This assumption is particularly justifiable in connection with claims that a contract has not been properly revised; any person interested in such a contract is free to demand that the revisions be made, and to ask the CFTC to find the changes are necessary under § 5a(10), 7 U.S.C. § 7a(10). An exchange normally has a strong incentive to make needed adjustments in its contracts in order to attract trading volume. "Very few futures contracts remain unchanged throughout their existence.... And the contract markets are not reluctant, as a rule, to amend their contracts as needed. Reticence can prove fatal to a contract, either because it will lead to abandonment of its use, or because another aggressive market will exploit that weakness by offering its own, improved version of the same contract." 1 P. Johnson, *supra* § 2.08 at 218. As for pre-trading suggestions made directly to the Commission, CFTC regulation 13.2, 17 C.F.R. § 13.2, provides that any person may petition the agency to exercise its power to amend a futures contract; and the legislative history of § 5a(10) of the CEA, 7 U.S.C. § 7a(10) specifically indicates that complaints from producers such as Wong concerning delivery-point terms should be thoroughly investigated. *See* S.Rep. No. 1131, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News 5843, 5864; *see also* 1 P. Johnson, *supra* § 2.14 at 234 (discussing contract users' ability to influence CFTC rulings on proposed contract terms); § 5a(12) of the CEA, 7 U.S.C. § 7a(12) (CFTC may not approve any rule of "major economic significance" until rule is published and interested persons have been allowed "to participate in the approval process through the submission of written data, views or arguments").

Moreover, Congress should not lightly be assumed to have intended to permit after-the-fact challenges to the soundness of contract rules, which would inevitably lead to the uncertainty of possible modification of executory futures contracts even in the absence of a market emergency. Significantly, the CFTC's power to force contract revisions under § 5a(10) of the CEA, 7 U.S.C. § 7a(10) does not extend to "contracts of

sale for future delivery in any months in which contracts are currently outstanding and open." The CFTC's power to force rule revisions under § 8a(7) of the CEA, 7 U.S.C. § 12a(7), is not limited where contracts are outstanding, but § 8a(7) requires the CFTC to provide "appropriate notice and opportunity for hearing," and so, as a practical matter, CFTC revision of outstanding contracts is unlikely, except in an emergency situation under § 8a(9) of the CEA, 7 U.S.C. § 12a(9). Furthermore, the legislative history of § 8a(9) comments that "nothing in the [CFTC] emergency powers section, ... or any other provision of the bill is to be used ... to violate unnecessarily the sanctity of contract." S.Rep. No. 1131, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News 5843, 5865. Whenever the CFTC does seek to impose amendments or new rules on an exchange, it must afford the exchange notice and an opportunity for a prior hearing—a procedure that contrasts sharply with an after-the-fact, judicial determination of what amendments the exchange should hypothetically have proposed to the CFTC. *See* §§ 5a(10) & 8a(7) of the CEA, 7 U.S.C. §§ 7a(10), 12a(7); *see also Commodity Exchange, Inc. v. CFTC,* 543 F.Supp. 1340 (S.D.N.Y.1982) (CFTC must afford opportunity for oral presentation before disapproving a proposed exchange rule under § 5a(12)), *aff'd,* 703 F.2d 682 (2d Cir.1983).

A further difficulty with allowing suits against exchanges for failure to propose amendments concerns the CFTC's pervasive control over exchange rules. All rules and rule revisions must be approved by the CFTC, § 5a(12) of the CEA, 7 U.S.C. § 7a(12), and, until they are modified by the CFTC, all approved rules must be enforced by an exchange, § 5a(8) of the CEA, 7 U.S.C. § 7a(8). The CFTC, moreover, has the power to impose rule amendments on exchanges. §§ 5a(10) & 8a(7) of the CEA, 7 U.S.C. §§ 7a(10), 12a(7). Allowing suits for exchange failures to propose rules would effectively create a new, judicial level of oversight concerning the terms of futures contracts. Given the extensive authority expressly granted the CFTC in this area, creation of such a judicial level of oversight seems inappropriate in the absence of clear statutory authority. A limited scope of judicial review for arbitrary or capricious decisions is consistent with CFTC control. *See* Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06; 1 P. Johnson, *supra* § 2.10 at 221–22; *WHT, Inc. v. FCC,* 656 F.2d 807, 809 (D.C.Cir.1981). But not even the Futures Trading Act of 1982 provides clear authority to review in private damages actions exchange failures to propose amendments.

Moreover, judicial oversight in this area would generate a potential for conflicts between the courts and the CFTC that Congress would have wanted to avoid. To conclude that an exchange's negligent or even bad-faith failure to propose a particular amendment caused a plaintiff harm, a court would have to find that, if proposed, the amendment would have been approved by the CFTC. The potential for conflict with the executive agency exists in that, notwithstanding a judicial determination that the CFTC would have adopted a needed amendment, the CFTC would remain free to reject the amendment as unnecessary. The CFTC suggests that this difficulty could be avoided by always requiring "changed conditions" from the time of the CFTC's last approval of a contract as a prerequisite to an action for failure to propose amendments. CFTC Brief 16. This suggestion is unpersuasive. While a "changed conditions" requirement might avoid judicial determinations that the CFTC erred in approving a given set of contract rules, it would not avoid CFTC determinations that a judicial ruling on the need for amendment proposals was wrong.

Decisions refusing to allow private actions for a securities exchange's allegedly negligent failure to propose self-regulatory rules provide a useful, albeit not controlling, analogy.[11] In *Cutner v. Fried,* 373

---

**11.** Defendants' suggest that the rule concerning securities-exchange failures to propose rule amendments is dispositive, but substantial differences exist not only between the regulatory schemes of the CEA and the securities acts, but also between securities exchanges and commodities exchanges. The primary goal of securities markets is allocating capital resources,

F.Supp. 4 (S.D.N.Y.1974), the Court dismissed the complaint insofar as it alleged a cause of action against the New York Stock Exchange for failure to make adequate rules governing stock specialists. The adequacy of specialist rules involved "judgmental factors which are within the special competence of the SEC," and if courts were to attempt to substitute their judgment for that of the agency, "the probability of inconsistent rulings as to the adequacy of exchange rules would be very great, thus creating havoc in the regulatory scheme designed by [C]ongress." 373 F.Supp. at 8–9; see also, e.g., Arneil v. Ramsey, 414 F.Supp. 334, 341–42 (S.D.N.Y.1976) ("Investors who believe that the [New York Stock] Exchange should have better ... rules should apply to the SEC to alter or supplement these rules ...."); Marbury Management, Inc. v. Alfred Kohn, Wood, Walker & Co., 373 F.Supp. 140, 143–44 (S.D.N.Y.1974).

A further concern undermining the notion that Congress intended to create a privately enforceable, exchange duty to propose contract amendments is the difficulty of the determinations which actions based on that duty would require. Thus, plaintiff in such an action would have to show harm caused by the poor hedging characteristics of a defective contract, but a court would be hard-pressed to determine what degree of variance between a traded commodity's cash and contract prices evinced a sufficient "defect". The final price of a futures contract rarely equals the cash price of the commodity during the specified delivery period; indeed, where, as in Wong, differences exist between the hedging commodity (Maine potatoes) and the hedged commodity (Idaho potatoes), the trader must expect a significantly imperfect hedge. See 1 P. Johnson, Commodities Regulation § 1.12 at 40–41 (1982). Moreover, traders who elect to retain futures

positions up to the time of delivery face special risks associated with the tendency of all futures contracts to reflect market conditions at their delivery points, rather than national market conditions, as delivery time draws near. See 1 P. Johnson, supra § 1.17 at 67. Even if a court could establish that a plaintiff's damages due to a variance between cash and futures prices sufficiently demonstrated the existence of a contract defect, the court would then be faced, not only with determining an appropriate contract amendment, but also with deciding whether the exchange should have proposed such an amendment and whether the CFTC would have accepted it. The legislative history of the 1974 amendments to the CEA make clear, however, that Congress considered analysis of futures contracts a highly specialized activity which helped to justify creation of a CFTC. See S.Rep. No. 1131, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Ad.News 5843, 5859–60. As former CFTC Chairman Johnson has testified, "the analysis of contracts to determine whether or not they can be used for hedging or price discovery is a rather unique form of analysis" which, at least among government agencies, only the CFTC "has the capacity or the skills" to conduct. Hearings on S. 2109 Before the Subcommittee on Agricultural Research and General Legislation of the Senate Comm. on Agriculture, Nutrition, and Forestry, 97th Cong., 2d Sess. 26 (1982) (testimony of Philip Johnson); see also 1 P. Johnson, supra § 2.08 at 218 (contract development "is an art, rather than a science"). Decisions of this sort differ in kind from familiar questions such as whether a manipulation or cornering occurred.

Finally, an implied remedy that would permit suits against exchanges for damages caused by contract defects has no support in

whereas that of commodities markets is hedging risks associated with commercial dealings in traded commodities. See 1 Johnson, Commodities Regulation xxvii–xxx, § 1.11 at 38 (1982) (emphasizing need to distinguish securities from commodities regulation). The hedging characteristics of traded contracts are thus essential to the purpose of commodities exchanges, and contract "rules" are not analo-

gous to the self-regulatory rules challenged in Cutner and other securities cases. As Wong concedes, if the rules challenged here were self-regulatory rules as opposed to rules setting the terms of a futures contract, then the analogy to cases involving securities exchanges would be dispositive, not merely persuasive, on the issue of conflict between the courts and the CFTC. See Plaintiff's Memorandum In Opposition 39.

prior, judicial precedent, a factor given substantial weight in both *Leist* and *Curran.* *See Leist,* 638 F.2d at 307–12; *Curran,* 456 U.S. at 378–82, 102 S.Ct. at 1839–41. No court has found a privately enforceable, exchange duty to amend futures contracts, so Congress cannot be said to have acquiesced in such a duty over time. On the contrary, the rule proposed would constitute a sharp departure from the courts' analogous and well-established refusal to allow private actions for a securities exchange's failure to propose allegedly necessary regulations. *See supra* at 1559–1560. (The analogy to securities-exchange decisions is particularly strong in this regard, given the recognized importance of such rulings for determinations concerning the scope of implied CEA actions. *See Leist,* 638 F.2d at 298 n. 14.) In sum, the unprecedented rule urged by Wong would substitute a hazardous and punitive mechanism—that discourages private participation in regulation—for the deliberate, remedial, administrative procedures that Congress expressly provided to accomplish all the contract revisions the CFTC considered appropriate.

B. *Defendants have satisfied any enforceable duty they may have had to propose contract revisions.*

█ Even if a privately enforceable, exchange duty to propose contract amendments were found under the CEA, the negligence standard proposed by Wong is untenably broad, for the same reasons that the negligence standard is inapplicable to other discretionary functions of exchanges, such as dealing with market emergencies. *See supra* 1537–1539. The narrower, CFTC standard involving an exchange's "reason to believe" that a contract's rules threaten market disorder and manipulation seems consistent with the knowing-failure-to-act formulation proposed for non-discretionary functions, such as controlling known manipulation conspiracies. *See supra* 1539–1540. This narrower standard, however, is also untenably broad for a function as sensitive and difficult as contract revision. Moreover, an exchange failure to propose needed contract amendments does not involve the inevitable suggestion of exchange wrongdoing which makes a knowing-failure-to-act standard consistent with a bad-faith standard in the area of an exchange's failure to control unlawful trading activity. Thus, the same bad-faith standard which applies to the Exchange's emergency action applies also to its allegedly improper failure to amend the Maine-potato contract. Wong has conceded that it does not allege bad faith amounting to fraud, and so its allegations concerning failure to amend the contract are deficient as a matter of law, regardless of whether a privately enforceable exchange duty to propose amendments exists in the first place.

Furthermore, even under the CFTC's proposed standard, defendants are entitled to summary judgment. The CFTC standard requires that an exchange be shown to have failed to act on the basis of information received after the last approved revision of the contract at issue. In this case, the events alleged as evidence of the Exchange's negligence in not proposing amendments all occurred before November 1976, when the CFTC itself took emergency action in response to a railroad-car shortage which threatened orderly potato-contract deliveries. Complaint ¶¶ 22–25; *see* [1975–77 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶¶ 20,234–37. The Exchange's potato contract, however, was approved, after substantial amendment, in early November 1976, and further amendments were approved in October 1977. *See* McFadden Affidavit (Aug. 31, 1982), Ex's C & D. In October 1979 the Secretary of Agriculture issued a study which recommended some of the contract revisions now advocated by Wong, but virtually all significant events analyzed in the study predated the October 1977 CFTC approval, and the study itself obviously could not have prompted revisions in contracts traded a year before the study's recommendations were published. *See* Secretary of Agriculture, *Potato Futures Study* (Sen.Comm. on Agric., 96th Cong., 1st Sess., Committee Print 1979).

Thus, all the deficiencies alleged by Wong to have been obvious, have existed since long before the contracts at issue were approved. If these are in fact inexcusable deficiencies, the CFTC is arguably as responsible for them as defendants, and they should have been corrected in the administrative process, not through an after-the-fact, punitive litigation.

C. *Wong's antitrust claim concerning contract revisions is without merit.*

 Insofar as the Fourth Count of Wong's complaint alleges an antitrust claim in connection with the Exchange's alleged failure to amend, such a claim is without merit. The allegedly defective contract rules are not anticompetitive on their face, and Wong has not indicated in what way he suffered any antitrust injury because of his short, potato-contract positions. In any event, given the CFTC's extensive authority to approve, alter, and supplement contract rules, such rules are not subject to antitrust challenge. *See Gordon v. New York Stock Exchange,* 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975); *United States v. National Ass'n of Securities Dealers,* 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975).

## V. *Conclusion*

The complaint in *Wong* is dismissed, Fed. R.Civ.P. 12(b)(6), and defendants are granted summary judgment in *Jordon, Spinale,* and alternatively in *Wong,* Fed.R.Civ.P. 56.

SO ORDERED.